NOT FOR PUBLICATION                                      (Doc. No. 52)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                            :
UNITED STATES OF AMERICA, ex rel.           :
LAPORTE, et al.,                            :
                                            :
            Plaintiffs,                     :        Civil No. 11-3523 (RBK/AMD)
                                            :
            v.                              :
                                            :        **OPINION**
PREMIER EDUCATION GROUP, L.P.               :
et al.,                                     :
                                            :
            Defendants.                     :
_____     :

**KUGLER**, United States District Judge:

This matter is a qui tam action, which Plaintiffs bring under the False Claims Act,

arising out of alleged fraudulent claims made by Premier Education Group, and its

subsidiary schools, to the Federal government.  Presently before the Court is Defendants'

motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1)

and 12(b)(6) (Doc. No. 52).  For the reasons set forth below, the motion to dismiss will

be granted.

## I.      FACTUAL BACKGROUND

Relators Laura LaPorte, Angela Davenport, Pamela Hone, Robert Biaselli, Kelli J.

Amaya, Amanda Kenny, and Doris Moody ("Plaintiffs") brought this qui tam action on

behalf of the United States of America against Defendants Premier Education Group,

L.P. and Premier Education Group, G.P., Inc. d/b/a Branford Hall Career Institute, Harris

School of Business, Salter College, The Salter School, Seacoast Career Schools, and Suburban Technical School (collectively, "PEG"), and John Does # 1-50, Fictitious Names (together with PEG, the "Defendants"), pursuant to the Federal Civil False Claims Act, 31 U.S.C. §§ 3729, et seq. ("FCA"). This action was originally brought on June 20, 2011 (Doc. No. 1), and the Complaint was subsequently amended four times. The Fourth Amended Complaint ("FAC") was filed on February 27, 2014 (Doc. No. 46).

In their FAC, Plaintiffs explain that their lawsuit is based on the actions of PEG, which allegedly made or caused to be made false claims and statements in order to participate in the Federal student financial aid programs ("Federal Programs"), from 2006 onward. (FAC ¶ 2; id. ¶ 97.) They claim PEG violated Federal regulations it was required to comply with in order to be eligible to receive Federal Program funding. Specifically, PEG violated provisions of the contractual agreements between PEG and the Department of Education ("DOE"), called Program Participation Agreements ("PPAs"), in which PEG agreed to abide by Federal regulations and not engage in material misrepresentations as a condition of PEG's eligibility to receive said funding. As required by the PPAs, PEG certified, each time it drew down student aid monies, that the funds were being expended in accordance with the conditions of those PPAs. (Id. ¶ 3.)

Congress established various student loan and grant programs under Title IV of the Higher Education Act of 1965, 29 U.S.C. §§ 1070 et seq. ("HEA"), including the Federal Pell Grant Program, the Federal Family Education Loan Program and the Federal Direct Loan Program. In 2008 Congress reauthorized the HEA, as amended, through its passage of the Higher Education Opportunity Act. (FAC ¶ 60.) In order to participate in the Title IV Federal Programs for financial aid, an institution such as PEG must (1)

establish institutional and program eligibility, and then (2) ensure student eligibility prior to disbursing the Federal Program funds.  (Id. ¶ 61.)  There are federal requirements for institutions that wish to participate in Title IV Federal Programs, including the requirement that a school be accredited and licensed to operate in each state in which it is doing business.  (Id. ¶ 64; 20 U.S.C. § 1001; 34 C.F.R. § 600.5(a)(4), (6).)  Institutions that wish to receive federal funds also may not make substantial misrepresentations to prospective applicants about the nature of the institution's educational programs or the employability of its graduates.  (FAC ¶ 65; 34 C.F.R. § 668.71; id. § 668.74; id. § 668.72.)  To qualify as eligible, a student must be enrolled or accepted for enrollment in an eligible program at an eligible institution, must have a high school diploma or recognized equivalent, unless an enumerated exception applies (such as, during the relevant time period, having "obtained a passing score specified by the Secretary on an independently administered test"), and must be maintaining "Satisfactory Academic Progress" in his or her course of study according to the school's published standards, and in accordance with Federal guidelines.  (FAC ¶ 62; 34 C.F.R. § 668.32; id. § 668.34.)[1]

All post-secondary schools must enter into PPAs with the DOE in order to be eligible to receive Title IV Federal Program funds, or have their students receive Title IV funding.  (FAC ¶ 67; 20 U.S.C. § 1094; 34 C.F.R. § 668.14.)  PPAs condition the initial and continued participation of an eligible institution in a Title IV Federal Program upon compliance with the regulations specified above.  (FAC ¶ 67; 34 C.F.R. § 668.14(a)(1).)  PEG has, since at least 2006, annually signed and submitted PPAs to the DOE on behalf

---

[1] Discussion of additional requirements for the various Title IV Grant and Title IV Loan funds, not pertinent to the Court's disposition of this motion, can be found in the FAC at paragraphs 71 to 87.

of all of its educational institutions throughout the United States.  (FAC ¶ 88.)  These PPAs signed by PEG contain the same certifications that PEG was in compliance with all the applicable regulations described <u>supra</u>.  (<u>Id.</u> ¶¶ 89-96.)  Plaintiffs aver that PEG has "claimed and received substantial sums in Title IV funding from the [DOE] as a result of its fraudulent conduct."  (<u>Id.</u> ¶ 97.)

The first of the specific allegations is that PEG made false statements and concealed material information from state agencies and the DOE in order to ensure that it would maintain its state licenses and accreditation status for each of its campuses in order to continue to receive Federal Program funding.  (<u>Id.</u> ¶¶ 4, 6.)  This included actions such as fabricating job placement statistics for graduates at its campuses, in order to remain licensed and accredited.  (<u>Id.</u> ¶ 6; <u>id.</u> ¶ 257-58; <u>id.</u> ¶ 308.)  Second, Plaintiffs allege that PEG engaged in false advertising in an attempt to induce students to enroll at its campuses, in violation of Federal Program regulations and its PPAs.  (<u>Id.</u> ¶ 7.)  This involved misrepresenting the accreditation status of certain programs, enrolling students into programs of study without disclosing that they would be effectively disqualified from employment in their chosen fields upon graduation, and misrepresenting the nature and success of PEG's career placement services.  (<u>Id.</u>; <u>id.</u> at 78-91.)[2]  Third, Plaintiffs aver that PEG engaged in fraudulent conduct in order to secure financial aid for students who, but for PEG's conduct, would not have been eligible for assistance from the Federal Programs.  (<u>Id.</u> ¶ 8.)  For example, PEG allegedly falsified records to make it appear that

---

[2] For purposes of clarity, each time the Court cites to a paragraph or range of paragraphs in one of the documents in the record it will use the "¶" symbol, and when it cites to a page or range of pages numbers it will use the notation "[document] at [page number]."

students had either graduated from a recognized high school or received a GED in order to permit unqualified students to enroll, and PEG improperly received and retained Federal Program assistance and monies for those ineligible students.  (Id.; id. at 41-55.). Fourth, PEG purportedly continued to falsify student records once they were enrolled and receiving Federal Program financial aid, in order to receive more Federal Program funding for which the students were in fact ineligible.  (Id. ¶ 9.)  To achieve this, PEG falsely certified students' "Satisfactory Academic Progress" on the Federal Program financial aid recipient list by falsifying attendance records for students who were no longer in attendance and changing student grades from failing to passing, and PEG falsified financial aid records in order to secure more Federal Program funding than students should have been eligible to receive.  (Id.; id. at 55-72.)  Finally, Plaintiffs allege PEG's employee compensation system, as designed and implemented, did not comply with the Incentive Compensation Ban in Title IV of the HEA.  (Id. ¶ 10; id. at 72-75.)

The named relators are all reportedly original sources of the allegations in the FAC.  (Id. ¶ 17.)  Relator Laura LaPorte (LaPorte) worked as the Registrar at the Harris School of Business ("HSB") in Linwood, New Jersey ("HSB-Linwood"), in 2006 and 2007, and she was responsible for administering admissions tests, tracking student attendance, and inputting student grades into the computer system.  (Id. ¶ 19.)  She resigned her employment with PEG voluntarily.  (Id.)  Relator Robert Biaselli ("Biaselli") worked as an instructor at HSB-Linwood in 2006 and 2007.  (Id. ¶ 22.) Relator Pamela Hone ("Hone") was an admissions representative at HSB-Linwood in 2006 and 2007.  (Id. ¶ 25.)  Relator Angela Davenport ("Davenport") was the Director of Education for HSB during 2009.  (Id. ¶ 28.)  In her role, Davenport worked directly with

the registrar at the HSB campus in Cherry Hill, New Jersey ("HSB-Cherry Hill"), and

was responsible for preparation of the HSB-Linwood personnel files.  (Id.)  She resigned

her employment with PEG voluntarily.  (Id. ¶ 29.)  Relator Kelli J. Amaya ("Amaya")

worked as the Externship Coordinator at HSB-Linwood from September, 2009, through

June, 2010, and in July, 2010 she was promoted to Director of Education/Externship at

HSB in Wilmington, Delaware ("HSB-Wilmington").  (Id. ¶ 32.)  She claims that, after

she reported problems at the HSB-Wilmington campus, she was first demoted and then

fired in January, 2011, as a result of "whistleblowing activities."  (Id.)  Relator Amanda

Kenny ("Kenny") was hired as a Financial Aid Administrator for HSB-Wilmington in

2009, and was promoted to Director of Financial Aid at HSB-Wilmington in January,

2011.  (Id. ¶ 35.)  As Director of Financial Aid she was responsible for the submission of

FAFSA forms to the DOE, for scheduling financial aid disbursements, for drawing down

Federal Program funds for HSB-Wilmington students, for preparing and processing all

internal and external paperwork and reports and correspondence to the DOE relating to

student financial aid, for monitoring each student's eligibility for financial aid on an

ongoing basis, for attending weekly manager meetings and financial aid conference calls

with other PEG schools, and for weekly meetings with the Director of Admissions and

other PEG managers to monitor the financial aid process on a student-by-student basis, as

well as to manage re-enrollments.  (Id.)  Relator Kenny voluntary resigned her position

with PEG in October, 2011.  (Id.)  Relator Doris Moody ("Moody") was the Registrar at

HSB-Wilmington from October, 2010, until August, 2012, at which point she alleges she

was constructively terminated due to her "whistleblowing activities."  (Id. ¶¶ 38-39.)  As

Registrar, her responsibilities included grade and attendance records input and generating reports of the same.  (Id. ¶ 38.)

In their FAC, Plaintiffs allege that Defendants violated the FCA by: (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval (FAC Count I (citing 31 U.S.C. § 3729(a)(1)(A)); (2) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim (FAC Count II (citing § 3729(a)(1)(B)); (3) conspiring to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) of § 3729(a)(1) (FAC Count III (citing § 3729(a)(1)(C));[3] and (4) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government (FAC Count IV (citing § 3729(a)(1)(G)).[4]  Additionally, Plaintiffs allege Defendants violated § 3730(h) by taking retaliatory action against relators Amaya and Moody in the terms and conditions of their employment because of lawful acts done by them in furtherance of this action under the FCA (FAC Counts V, VII).   Finally, Plaintiffs also allege that Defendants violated the rights of relators Amaya and Moody to be free from intentional infliction of emotional distress (FAC Counts VI, VIII).

---

[3] Plaintiffs also alleged violation of § 3729(a)(3) to the extent that the conduct complained of preceded the FCA's May 20, 2009 amendments.  The Court notes that the language of this prior version is substantially similar to the current version, but for the reasons discussed infra in its discussion of Counts I-IV, it need not parse the applicable versions of the statutes and the offenses by date.

[4] Here too Plaintiffs allege a violation of § 3729(a)(7) under the prior version, though as noted supra at note 3, is not relevant for purposes of the Court's analysis.

As indicated above, the original Complaint was filed on June 20, 2010, under seal, the Third Amended Complaint was unsealed on July 2, 2013 (Doc. No. 18), and the FAC was filed on February 27, 2014.  On March 26, 2014, Defendants filed the present motion to dismiss the FAC.  The United States filed its Notice of Election to Decline Intervention on July 2, 2013, (Doc No. 17), and a Statement of Interest in Response to Defendants' Motion to Dismiss on May 21, 2014 (Doc. No. 60).[5]

In Defendants' motion to dismiss they argue that Plaintiffs' action must be dismissed for lack of jurisdiction under 31 U.S.C. § 3730(b)(5) and § 3730(e)(4).  (Defs.' Br. at 7-15.)  Additionally, they argue the claims are barred by the applicable statute of limitations.  (Id. at 15-16).  In the alternative, if the Court were reach the merits of Plaintiffs' claims, Defendants move to dismiss Counts I-IV for failure to properly plead pursuant to Rule 8 and to plead fraud with particularity pursuant to Rule 9(b), (id. at 16-28), and/or to dismiss all Counts for failure to state a claim pursuant to Rule 12(b)(6). (Id. at 28-55.)

## II.    LEGAL STANDARD

Defendants move to dismiss Plaintiffs' FAC based on lack of subject-matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). "When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot."  In re

---

[5] In its statement of interest, the United States only takes a position concerning certain aspects of Defendants' Motion to Dismiss, specifically one of Defendants' arguments in favor of dismissal under Rule 12(b)(6) for Counts I-IV.  For the reasons set forth infra, the Court need not address these arguments.

Corestates Trust Fee Litig., 837 F. Supp. 104, 105 (E.D. Pa. 1993).  Because the Court

concludes that there is no jurisdiction to hear only certain Counts in the FAC, both the

Rule 12(b)(1) and Rule 12(b)(6) standards are relevant.

Where a defendant moves to dismiss under Rule 12(b)(1) for lack of subject-

matter jurisdiction, plaintiff bears the burden of proving by a preponderance of the

evidence that the Court has subject matter jurisdiction. See Gould Electronics Inc. v.

U.S., 220 F.3d 169, 178 (3d Cir. 2000).   A district court may treat a party's motion to

dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) as either a facial or

factual challenge to the court's jurisdiction.  Id. at 176.  A facial challenge is one in

which a defendant argues "that the allegations on the face of the complaint, taken as true,

are insufficient to invoke the court's jurisdiction."  Turicentro, S.A. v. Am. Airlines, Inc.,

303 F.3d 293, 300 & n.4 (3d Cir. 2002).  "In reviewing a facial attack, the court must

only consider the allegations of the complaint and documents referenced therein and

attached thereto, in the light most favorable to the plaintiff."  Gould, 220 F.3d at 176

(citing PBGC v. White, 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss an action for

failure to state a claim upon which relief can be granted.  When evaluating a motion to

dismiss, "courts accept all factual allegations as true, construe the complaint in the light

most favorable to the plaintiff, and determine whether, under any reasonable reading of

the complaint, the plaintiff may be entitled to relief."  Fowler v. UPMC Shadyside, 578

F.3d 203, 210 (3d Cir. 2009) (quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233

(3d Cir. 2008)).  In other words, a complaint survives a motion to dismiss if it contains

sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its

face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

To make this determination, a court conducts a three-part analysis. Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010). First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Id. (quoting Iqbal, 556 U.S. at 675). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 131 (quoting Iqbal, 556 U.S. at 680). Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Id. (quoting Iqbal, 556 U.S. at 680). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. A complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible. Id.

### III.   DISCUSSION

Defendants have moved to dismiss Plaintiffs' claims for lack of jurisdiction pursuant to Rule 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6), as well as for failure to properly plead pursuant to Rule 8 and to properly plead fraud pursuant to Rule 9(b), and as being barred by the applicable statutes of limitations. For the reasons discussed below, the Court will analyze Defendants' motion to dismiss Counts I-IV of the FAC together, and will dismiss those Counts for lack of jurisdiction. The Court will then discuss Counts V and VII together, and dismiss those Counts for failure to state a claim. Finally, because no federal claims remain, the Court will decline

to exercise supplemental jurisdiction over the remaining state law claims, and will dismiss Counts VI and VIII.

### a. Counts I-IV

Defendants move first to dismiss the FAC for lack of jurisdiction pursuant to § 3730(b)(5).[6]  Because the Court finds that <u>Bumgarner</u>[7] was a "related action" within the meaning of § 3730(b)(5), the court will dismiss Counts I-IV for lack of jurisdiction, and will not reach Defendants' other arguments with respect to those Counts.

### i. **Bumgarner is a Related Action**

Under § 3730(b)(5), a later-filed complaint is barred if it arises "from events that are already the subject of existing suits."  <u>U.S. ex rel. LaCorte v. Smithkline Beecham Clinical Laboratories, Inc.</u>, 149 F.3d 227, 232 (3d Cir. 1998); <u>see also</u> <u>id.</u> at 234 n.6 ("[W]e may decide whether the later complaints allege the same material elements as

---

[6] Defendants' arguments for dismissal based on lack of jurisdiction pursuant to § 3730(b)(5) are not applicable with respect to the remaining counts.  Section 3730(b) applies only to actions arising under § 3729.  See § 3730(b)(5) ("When a person brings an action under <u>this subsection</u> …"); § 3730(b)(1) ("A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. …").  Counts V and VII arise under § 3730(h), and Counts VI and VIII arise under state tort law.

Nor does the Court find that it lacks jurisdiction to hear Defendants' claims in Counts V-VIII pursuant to § 3730(e)(4).  By its terms, § 3730(e)(4) does not apply to Plaintiffs' state law claims in Counts VI and VIII.  <u>See</u> § 3730(e)(4)(1) ("The court shall dismiss an action or claim <u>under this section,</u> unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed").  Plaintiffs intentional infliction of emotional distress claims do not arise under § 3730, so the Court does not lack jurisdiction under § 3730(e)(4) over Counts VI and VIII.

While relators Amaya's and Moody's retaliation claims pursuant to § 3730(h) technically do arise under § 3730, the Court questions whether it is appropriate and consistent with Congress' intent to apply the public disclosure bar in § 3730(e)(4) to retaliation claims under § 3730(h).  The Court need not answer this question, however, because Defendants have not argued in their briefs, nor have they attached materials to those briefs, suggesting that the retaliation claims in Counts V and VII are barred by the public disclosure bar.  (<u>See</u> Defs.' Br. at 11-15; Defs.' Rep. Br. at 3-5.)  Accordingly, the Court finds it does not lack jurisdiction to hear Counts V and VII of the FAC.

[7] <u>Bumgarner et al. v. Premier Education Group et al.</u>, No. 10-787 (D.N.J. filed Feb. 17, 2010) ("<u>Bumgarner</u>").

11

claims in the original lawsuits simply by comparing the original and later complaints.")
The subsequent case "need not rest on precisely the same facts as a previous claim to run
afoul of this statutory bar.  Rather, if a later allegation states all the essential facts of a
previously-filed claim, the two are related and section 3730(b)(5) bars the later claim,
even if that claim incorporates somewhat different details."  Id. at 232-33; see also U.S.
ex rel. Lujan v. Hughes Aircraft Co., 243 F.3d 1181, 1189 (9th Cir. 2001) ("§ 3730(b)(5)
bars later-filed actions alleging the same material elements of fraud described in an
earlier suit, regardless of whether the allegations incorporate somewhat different
details."); id. at 1188-89 (noting the "common principle" in cases applying § 3730(b)(5)
is that it "'precludes a subsequent relator's claim that alleges the defendant engaged in the
same type of wrongdoing as that claimed in a prior action even if the allegations cover a
different time period or location within a company,'" and endorsing the Third Circuit's
reasoning in LaCorte) (quoting U.S. ex rel. Capella v. United Technologies Corp., 1999
WL 464536, at *9 (D. Conn. June 3, 1999)).  Also, as the Third Circuit noted in LaCorte,
"duplicative claims do not help reduce fraud or return funds to the federal fisc, since once
the government knows the essential facts of a fraudulent scheme, it has enough
information to discover related frauds."  LaCorte. 149 F.3d at 234; see also U.S. ex rel.
Shea v. Cellco Partnership, 748 F.3d 338, 342 (D.C. Cir. 2014) (finding that where two
complaints allege the same fraudulent scheme, the first complaint "would suffice to equip
the government to investigate [Plaintiff's] expanded allegations in [the second
complaint.]") (citing U.S., ex rel. Batiste v. SLM Corp., 659 F.3d 1204, 1209 (D.C. Cir.
2011)); Lujan, 243 F.3d at 1187 ("The first-filed claim provides the government notice of
the essential facts of an alleged fraud, while the first-to-file bar stops repetitive claims.")

In Bumgarner the relators alleged substantially similar claims to those Relators presently allege in Counts I-IV.  To begin, Bumgarner was

> an action to recover damages and civil penalties … for violations of the False Claims Act arising from false or fraudulent records, statements, or claims, or any combination thereof, [PEG], their agents, employees, or co-conspirators, or any combination thereof, with respect to false claims for obtaining financial aid from students in the form of loans and grants, which claims were made to the federal government…

(Ex. D to Defs.' Br., Bumgarner Compl. ("Bumgarner Compl.") ¶ 3; see also id. ¶ 27 (describing liability under 31 U.S.C. § 3729(a)(1), (2) for anyone who "knowingly presents or causes a false or fraudulent claim to be presented for payment, or to a false record or statement made to get a false or fraudulent claim paid by the government.").)

The instant case is

> an action to recover damages and civil penalties on behalf of the United States, arising from false statements and claims that PEG knowingly presented to, or caused to be presented to, the United States in violation of the FCA.
>
> PEG knowingly presented and/or has made, or caused to be made, the false claims and statements at issue, in order to participate in the Federal student financial aid programs … PEG knowingly submitted, or caused to be submitted to the Federal Programs, numerous false claims for payment arising from PEG's fraudulent course of conduct.

(FAC ¶¶ 1-2; see also id. at 108-111 (alleging violations of 31 U.S.C. § 3729(a)(1)(A)-(C), (G) in Counts I-IV).)  Both complaints allege that PEG violated the terms of the Title IV Federal Programs in which it participated, in order to fraudulently obtain funds from the Federal government.  (See Bumgarner Compl. ¶¶ 24-25 (describing requirements under 20 U.S.C. §§ 1001 et seq.); FAC at 27-29 ("C. PEG's Participation in Title IV, HEA Programs").)

13

Bumgarner was commenced on February 17, 2010, and dismissed on September

10, 2013.  (Ex. E to Def.'s Br., Bumgarner Docket Report ("Bumgarner Docket"), Doc.

Nos. 1, 12.)[8]  The named relator, Larry Bumgarner, was allegedly employed at HSB-

Linwood from 2009 to 2010, the same location five of the seven relators in the present

action were apparently employed.  (Bumgarner Compl. ¶¶ 10, 13(9)(G), 33.)  Bumgarner

named as defendants PEG and the HSB, indicating that PEG operated Branford Hall

Career Institute, Salter College, the Salter School, Seacoast Career Schools, Suburban

Technical School, Hallmark Institute of Photography, and Harris School of Business,

which has campuses in Cherry Hill, Linwood, Trenton, and Stratford, New Jersey, Upper

Darby, Pennsylvania, and Wilmington and Dover, Delaware.  (Id. ¶¶ 11-12.)[9]

Importantly, the Bumgarner complaint rested on many similar factual allegations

to those found in the FAC, including:

- Allegations of misrepresentations to accreditors, including
  misrepresentations regarding job placement.  (Compare Bumgarner

---

[8] A week later the district court entered a modified Order of Dismissal on September 16, 2013, clarifying that the dismissal was without prejudice, after the United States filed a letter on September 13, 2013, requesting that any dismissal reflect that it was without prejudice to the United States, as it had not consented to the dismissal under 31 U.S.C. § 3730(b)(1).  (See Bumgarner Docket, Doc Nos. 13-14.)

[9] While Plaintiffs argue that the allegations in Bumgarner are "substantively, temporally, and geographically narrow," because Larry Bumgarner only worked at HSB-Linwood for sixth months, and only as a business instructor, (Pls.' Opp'n at 10), the Court notes that Bumgarner alleged fraud that extended beyond the HSB-Linwood location to the same extent Relators alleged fraud in the instant case. (See Bumgarner Compl. ¶¶ 11-12 (identifying seven schools owned and operated by PEG, as well as the seven HSB locations); id. ¶ 31 (describing various allegations against both HSB and PEG); id. ¶ 98 (alleging, based on relator Bumgarner's independent investigation of certain claims made against the Salter School, that PEG is committing similar frauds at all of its schools); id. ¶¶ 101-02 (noting online posting by alleged former admissions employee from a different HSB location that raised many of the same fraud accusations as relator Bumgarner); see also id. at 74-75 ("VII. Defendants' Liability") (alleging that HSB and PEG submitted fraudulent claims through "its employees, agents, management and owners," to the United States and "to the State of New Jersey and other state governments to collect financial aid") (emphasis added).)  In the present matter, relators LaPorte, Biaselli, and Hone only worked for the HSB-Linwood campus, while relator Davenport worked at HSB-Linwood and HSB-Cherry Hill, relator Amaya worked at HSB-Linwood and HSB-Wilmington, and relators Kenny and Moody only worked at HSB-Wilmington, (see FAC at 6-12), yet here too Relators' claims of fraud against PEG are corporate-wide, and are not limited to the HSB campuses they had personal knowledge of.  (See FAC ¶¶ 102-28.)

Compl. ¶ 13(1); id. ¶ 13(8-2);[10] id. ¶ 14(A); id. ¶ 30; id. ¶ 31(C); id. ¶ 31(H); id. ¶ 44; id. ¶ 52 (alleging relator Bumgarner was instructed by school officials to lie to accreditors); id. ¶ 96; with FAC ¶¶ 257-77 ("ii. PEG Misrepresented Its Loss of Institutional Accreditation and Lied to Accreditation Agencies"); id. ¶¶ 262-63; id. ¶ 265 ("PEG used misleading criteria to create a false impression of its job placement success … PEG used various 'tricks of the trade' to report misleadingly its alleged placements."); ¶ 277 ("PEG knowingly falsified or manipulated the job placement data it disclosed to … accrediting bodies … in order to … mislead accrediting bodies regarding the job placement success of PEG programs.").)

- Allegations that Defendants misled students regarding their career placement prospects. (Compare Bumgarner Compl. ¶ 30 ("When students graduate they find out that they are not qualified for the types of jobs that the [PEG] and the [HSB] has promised them."); id. ¶¶ 81, 85 (noting that PEG was allegedly on notice regarding the sub-standard level of education students were receiving and alleging that PEG was fraudulent covering up the situation); id. ¶ 96; with FAC ¶¶ 259-277 ("PEG Misled Prospective Students Regarding Its Career Placement Performance").)

- Allegations regarding the admission of unqualified students. (Compare Bumgarner Compl. ¶ 13(6); id. ¶ 31(E); id. ¶¶ 43-44; id. ¶¶ 70-71 ("The students, after taking the [entrance exam] were ushered to the financial aid office where they were signed up for financial aid whether they passed the test or not."); id. at 59, ¶ 101 (anonymous alleged former HSB-Cherry Hill employee stating, "basically [HSB employees] can tweek [sic] the admissions test to get students in the door."); with FAC ¶¶ 131-60 ("1. PEG Admitted Students Who Were Obviously Unqualified for Admission, and Who Were Incapable of Completing the Educational Program"); id. ¶¶ 132-45 (admission of students with no high school diplomas or GEDs); id. ¶¶ 146-56 (PEG admitted known felons who were either ineligible for financial aid or could not obtain licensure in their chosen fields); id. ¶¶ 157-70 (admission of learning-disabled, non-English speaking, and illiterate students).)

- Allegations of altered attendance records and course grades. (Compare Bumgarner Compl. ¶ 13(8-2); id. ¶ 14(B); id. ¶ 31(M) (PEG "discharges and gets rid of students yet keeps the financial aid money"); id. ¶ 31(O) (allegations of falsifying classroom

---

[10] The complaint in Bumgarner contains two subsections labeled "8," in paragraph 13, which the Court will refer to as ¶ 13(8-1) and ¶ 13(8-2) respectively. (See Bumgarner Compl. at 6-7, ¶ 13(8-1); id. at 8-9 ¶ 13(8-2).)

hours); <u>id.</u> ¶ 102 ("grades are altered to keep the numbers up");
<u>with</u> FAC ¶¶ 176-226 ("3. PEG Altered Student Grades from
Failing to Passing in Violation of Federal Law Requiring Financial
Aid Recipients to Show They Are Making 'Satisfactory Academic
Progress' in Their Programs").)

- Allegations of altered or falsified admission exams. (<u>Compare</u>
  <u>Bumgarner</u> Compl. ¶ 31(F) (alleging PEG "fraudulently
  administers ability-to-benefit tests"); <u>id.</u> ¶¶ 69-70 ("the entrance
  exam was a fraud and anybody and everybody passed it … if
  students could not pass it then the [HSB] would alter the results");
  <u>id.</u> at 59, ¶ 101 (allegations of anonymous former HSB-Cherry Hill
  employee); <u>with</u> FAC ¶ 299(iii) ("admissions representatives, who
  changed failing Wonderlic admissions test scores in order to admit
  students who would not qualify"); <u>id.</u> ¶ 316(i) (allegation of a
  student permitted to enroll despite failing the admissions test).)

- Allegations that Defendants used high pressure tactics to enroll
  students. (<u>Compare Bumgarner</u> Compl. ¶ 13(5) (describing the
  "hard sell" techniques used by the HSB financial aid office to
  coerce students into signing up for financial aid, regardless of
  whether they qualify); <u>id.</u> ¶ 98(H) (alleging prospective applicants
  are required to be interviewed in person so that employees can
  "hard sell" enrollment in PEG schools); <u>id.</u> at 59, ¶ 101
  (anonymous alleged former HSB Cherry Hill admissions
  employing stating, "it's all about the numbers and we have to
  maintain a certain amount of leads per month."); <u>with</u> FAC ¶¶ 289-
  305 ("E. PEG Used Prohibited Incentive Compensation To Induce
  Employees To Participate in Its Fraudulent Scheme").)

The Court notes that certain allegations contained in the instant Complaint were

not included in the <u>Bumgarner</u> Complaint.[11] This fact does not undermine the relatedness

of these two complaints. See <u>LaCorte</u>, 149 F.3d at 234. Significantly, both claims assert

---

[11] <u>See, e.g.</u>, FAC ¶¶ 171-75 ("2. PEG Completed FAFSA Applications for Prospective Students Who Were
Not Competent to Understand the Financial Obligations They Were Undertaking"); <u>id.</u> ¶¶ 225-36 ("5. PEG
Used Third Parties to Falsify Attendance Records in Order to Falsely Certify Students' Eligibility for
Federal Financial Aid"); <u>id.</u> ¶¶ 278-86 ("3. PEG Misled Prospective Students Regarding Their Ability to
Transfer Course Credits to Other Institutions and Programs"). While Plaintiffs contend that <u>Bumgarner</u> did
not allege a violation of the FCA's Incentive Compensation Ban, (Pls.' Opp'n at 10 n.3), the Court notes
that allegations in the <u>Bumgarner</u> complaint of bonuses for PEG admissions and financial aid personnel,
(see <u>Bumgarner</u> Compl. ¶ 31(P)), allegations of "hard sell" techniques employed by those same employees
(<u>id.</u> ¶ 13(5); <u>id.</u> ¶ 98(H)), and the allegation that employees were required to keep admissions numbers at a
certain level, (<u>id.</u> ¶ 101), taken together, are enough to allege a violation of the FCA's Incentive
Compensation Ban. (<u>Cf.</u> FAC ¶¶ 289-305 ("PEG Used Prohibited Incentive Compensation to Induce
Employees to Participate in Its Fraudulent Scheme").

16

that the foregoing, remarkably similar, allegations were part of a scheme perpetrated by PEG and its subsidiary schools to file false claims to misrepresent their accreditation status or maintain their accreditation status, and to misrepresent student academic eligibility and financial aid eligibility, with the purpose of participating in Federal student financial aid programs, and receiving millions of dollars of federal financial aid disbursements, for which PEG and the students in its schools were not eligible. (See Bumgarner Compl. ¶ 14; id. ¶¶ 30-31; FAC ¶¶ 1-12.)  Bumgarner sufficed to give the government notice of PEG's alleged false claims, and that complaint alleged the same material elements as those presently alleged for violations of 31 U.S.C. § 3729(a)(1)(A)-(C), (G), in Counts I-IV of the FAC.  See LaCorte, 149 F.3d at 233 ("[T]he district court correctly interpreted the statute as barring a later-filed action alleging the same elements of a fraud described in an earlier suit.")

The reasons for the court's dismissal in Bumgarner are not important for the purposes of determining whether that action deprives this Court of jurisdiction to hear related claims in the present action.  See U.S., ex rel. Joseph Piacentile v. Sanofi Synthelabo, Inc., No. 05-2927, 2010 WL 5466043, at *4 (D.N.J. Dec. 30, 2010) ("[E]ven complaints that are later dismissed have preclusive effect.").  The record suggests the actions taken in Bumgarner were sufficient to put the government on notice to the alleged false claims submitted by PEG.  The Complaint was filed under seal and the government was given the required 60 day period to investigate the claims.  More than three years after the original complaint was filed in Bumgarner, the government filed its Notice of Election to Decline Intervention on June 29, 2013.  (Bumgarner Docket, Doc. No. 9.) Considering Counts I-IV in the present action "related," and thus barred by the first-to-

file rule, would not defeat the government's goal of eliminating fraud.[12]  It is evident that the government is already aware of the essential facts pertaining to PEG's alleged fraudulent scheme, and has enough information from the Bumgarner complaint to discover related schemes at other PEG schools and within the PEG corporate structure. LaCorte, 149 F.3d at 234 ("In addition, [ ] duplicative claims do not help reduce fraud or return funds to the federal fisc, since once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds.")

For these reasons, the Court finds that Counts I-IV of the FAC are "related actions" for purposes of § 3730(b)(5).

### ii.  The First-to-File Rule

Having determined that Counts I-IV of the present case are a "related action" to the previously filed complaint against PEG in Bumgarner, the Court will now address Plaintiffs' and Defendants' disagreement concerning whether the first-to-file bar applies when the initial action is no longer pending.  (See Defs.' Br. at 10 n.3; Pls.' Opp'n at 5-8; Defs.' Rep. at 2.)  The Third Circuit has not addressed this particular issue.  But see LaCorte, 149 F.3d at 233 ("[T]he district court correctly interpreted [§ 3730(b)] as barring a later-filed action alleging the same elements of a fraud described in an earlier

---

[12] Though the Court does not examine the reasons for the dismissal of the complaint in Bumgarner, it notes that even if Bumgarner had been dismissed for failure to meet the heightened pleading requirement under Fed. R. Civ. Pro. 9(b), Bumgarner may still be considered a "related action" for purposes of § 3730(b)(5). LaCorte, 149 F.3d 234 ("[Plaintiffs] argue that unless § 3730(b)(5) is limited to suits alleging identical facts, any relator who discovers a false claim will simply plead a very broad cause of action so as to preempt claims by later plaintiffs.  We do not believe that the decision we reach today creates an undue risk that plaintiffs will engage in such artful pleading.  Federal Rule of Civil Procedure 9(b) requires plaintiffs to plead fraud with particularity, specifying the time, place and substance of the defendant's alleged conduct. … This requirement provides sufficient deterrence against overly broad allegations.  Moreover, there is no indication that any of the original plaintiffs in this case worded their complaints in excessively general terms for the purpose of thwarting later claims.") (internal citation omitted).

suit."); Piacentile, 2010 WL 5466043, at *4 ("On its face, § 3730(b)(5) is 'exception free.' ... Because allowing an exception in the event of first-filed claims that may be later dismissed would run counter to the purpose of the first-filed bar, the Court declines to grant an exception in this case.") (internal citation omitted) (citing U.S. ex rel. Lujan v. Hughes Aircraft Co., 243 F.3d 1181, 1187 (9th Cir. 2001)).

Section 3730(b)(5) of the FCA states that "[w]hen a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." This section of the FCA "attempts to reconcile two conflicting goals, specifically, preventing opportunistic suits, on the one hand, while encouraging citizens to act as whistleblowers, on the other." LaCorte, 149 F.3d at 233 (citing U.S. ex rel. Stinson, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1154 (3d Cir. 1991)); see also id. at 1176 n.5 (Scirica, J., dissenting) ("[O]nce an eligible relator has brought an action, no other private party can bring an action based on the same information. See § 3730(b)(5). This situation creates a potential 'race to the courthouse' among eligible relators, but such a race may also spur the prompt reporting of fraud.")

While three other circuits have concluded otherwise,[13] this Court agrees with the recent decision from the D.C. Circuit, holding that "the first-to-file bar applies even if the

---

[13] The Seventh Circuit concluded in U.S. ex rel. Chovanec v. Apria Healthcare Grp., Inc., 606 F.3d 361 (7th Cir. 2010), that "§ 3730(b)(5) applies only while the initial complaint is 'pending,'" id. at 365, but it reached that conclusion by reference to its prior conclusory statement that "if one person 'brings an action' then no one other than the Government may 'bring a related action' while the first is 'pending.'" Id. at 362. The issue in the case, however, was the relatedness of two actions, and the statements regarding pendency were more dicta than holding. Similarly, the Tenth Circuit's statements in In re Natural Gas Royalties Qui Tam Litigation, 566 F.3d 956 (10th Cir. 2009), that "§ 3730(b)(5) applies only when another qui tam action is 'pending,'" and "if [a] prior claim is no longer pending, the first-to-file bar no longer applies," are dicta, and without further explanation in the opinion. Id. at 964. In U.S. ex rel. Carter v. Halliburton, 710 F.3d 171 (4th Cir. 2013), the Fourth Circuit relied on In re Natural Gas and Chovanec in concluding that "once a

initial action is no longer pending." <u>Shea</u>, 748 F.3d at 343.  There the court noted that the first-to-file bar "commences 'when a person brings an action under [§ 3730(b)],' and thence forth bars any action 'based on the facts underlying the pending action.'" <u>Id.</u> When viewing § 3730(b)(5) as a whole, "the simplest reading of 'pending' is the referential one; it serves to identify which action bars the other."  <u>Id.</u>  Had Congress intended the first-to-file bar to be temporal, as it has in other contexts, it could have expressed that intent unambiguously.  <u>Id.</u> (noting examples in statutes, such as where "Congress has barred 'any claim [in the Court of Federal Claims] for … which the plaintiff … <u>has pending</u> in any other court any suit or process against the United States….' (emphasis added)," in 28 U.S.C. § 1500, and where Congress precludes "a person from bringing a vaccine-related claim in the Court of Federal Claims if he or she '<u>has pending</u> a civil action for damages for a vaccine-related injury or death' (emphasis added)" under 42 U.S.C. § 300aa-11(a)(5)(B)).  <u>Id.</u> at 344.  According to the D.C. Circuit, without such express language, one must read the first-to-file bar to say "no person other than the Government may intervene or bring a related action <u>while the first action remains pending</u>," in order to find a clear intent to limit the first-to-file bar temporally. <u>Id.</u> at 343.

The D.C. Circuit's reading is also consistent with the policy considerations behind this section.  "The resolution of a first-filed action does not somehow put the government

---

case is no longer pending the first-to-file bar does not stop a relator from filing a related case."  <u>Id.</u> at 183. There the court actually confronted the meaning of "pending" as a controlling issue, but did so without considering any other possible meaning of the phrase in § 3730(b)(5), and it relied on two decisions where the meaning of the term was neither essential to the holding or discussed meaningfully.  Decisions from other circuits are not controlling on this Court, but for the reasons discussed <u>infra</u>, the Court finds the recent decision from the D.C. Circuit more persuasive.

off notice of its contents." Id. at 344.  In fact, "reading the bar temporally would allow related qui tam suits indefinitely—no matter to what extent the government could have already pursued those claims based on earlier actions. Such duplicative suits would contribute nothing to the government's knowledge of fraud." Id.; see also U.S. ex rel. Batiste v. SLM Corp., 659 F.3d 1204, 1208 (D.C. Cir. 2011) ("[§ 3730(b)(5)'s first-to-file bar] furthers the statute's 'twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own.'") (quoting U.S. ex rel. Hampton v. Columbia/HCA Healthcare Corp., 318 F.3d 214, 217 (D.C. Cir. 2003); LaCorte, 149 F.3d at 234 ("The 1986 amendment, which introduced the current version of section 3730(b)(5), sought to achieve 'the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own.'") (citing U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 650 (D.C. Cir. 1994)).

Nor does such a reading of § 3730(b)(5) create the danger that opportunistic plaintiffs with no inside information would displace actual insiders with knowledge of the fraud.[14]  When comparing the two complaints for relatedness, the Court must first determine whether the prior complaint rested on the same essential facts as the subsequent complaint, which it does by reviewing the complaints side-by-side.  LaCorte,

---

[14] But see Campbell v. Redding Medical Center, 421 F.3d 817, 824-25 (9th Cir. 2005) (discussing the application of the "jurisdictional prerequisites of § 3730(e)(4)," the Court found that it would be antithetical to the purposes of the FCA for a prior claim, jurisdictionally deficient under § 3730(e)(4), to bar a subsequent claim under § 3730(b)(5), because it would permit opportunistic non-original source plaintiffs, acting on publicly disclosed information, to bar complaints by subsequent original source relators).  This Court does not have cause to reach the issue of whether a prior complaint, jurisdictionally deficient under § 3730(e)(4), bars a subsequent complaint under § 3730(b)(5), and expresses no opinion on the matter.

149 F.3d at 234 n.6.  If the second-in-time complaint is related, resting on the same material alleged facts, then the prior complaint necessarily contained similar information to place the government on notice of the alleged fraud.  Even a complaint which did not plead fraud with particularity in the first instance, <u>see</u> Fed. R. Civ. Pro. Rule 9(b), may bar a subsequent fraud claim adequately pleaded, so long as it alleged the essential facts to put the government on notice.  <u>See</u> <u>Batiste</u>, 659 F.3d at 1210 ("Section 3730(b) is designed to allow recovery when a <u>qui tam</u> relator puts the government on notice of potential fraud being worked against the government, but to bar copycat actions that provide no additional material information.  As the district court found, a complaint may provide the government sufficient information to launch an investigation of a fraudulent scheme even if the complaint does not meet the particularity standards of Rule 9(b).")[15] By comparing the complaints for relatedness, even when the previous complaint was dismissed prior to the filing of the present action, this Court notes that it serves the function of preventing opportunistic plaintiffs from filing similar claims for alleged fraud of which the government is already aware, while also permitting subsequent fraud claims, which rest on essential elements and allegations of fraud not previously alleged, to proceed.

---

[15] Such a policy does not undermine Congress' purposes or incentives either, as those who race to file first ostensibly hope to recover monetarily, and cannot do so if their complaint is dismissed under Rule 9(b).  <u>See</u> <u>Batiste.</u> 659 F.3d at 1211 ("The first plaintiff's complaint is still subject to the Rule 9(b) pleading requirements in order for a court to hear the case.  If the first relator did not plead fraud with particularity, his complaint would be dismissed and he would lose his own shot at monetary reward.  The threat of a second application of Rule 9(b) is unnecessary."); <u>LaCorte</u>, 149 F.3d at 234 ("[Plaintiffs] argue that unless § 3730(b)(5) is limited to suits alleging identical facts, any relator who discovers a false claim will simply plead a very broad cause of action so as to preempt claims by later plaintiffs. We do not believe that the decision we reach today creates an undue risk that plaintiffs will engage in such artful pleading.  Federal Rule of Civil Procedure 9(b) requires plaintiffs to plead fraud with particularity, specifying the time, place and substance of the defendant's alleged conduct.  This requirement provides sufficient deterrence against overly broad allegations.") (internal citation omitted).

Because the Court reads § 3730(b)(5) as barring <u>all</u> subsequent "related actions" based on the underlying facts of the prior claim, and it finds Counts I-IV are "related" for purposes of this section, the Court will dismiss Counts I-IV with prejudice as to all parties except the government.

### b.  Counts V and VII

In Counts V and VII, Plaintiffs allege that Defendants retaliated against relators Amaya and Moody for their whistleblowing activities, in violation of § 3730(h). Defendants argue that Plaintiffs' § 3730(h) claims must be dismissed because both Counts fail to state a <u>prima facie</u> case for retaliation under the statute.  (Defs.' Br. at 51-53.)  For the following reasons, the Court agrees with the Defendants.

To state a claim under § 3730(h), a plaintiff must show "(1) he engaged in 'protected conduct,' (i.e., acts done in furtherance of an action under § 3730) and (2) that he was discriminated against because of his 'protected conduct.'"  <u>Hutchins v. Wilentz, Goldman & Spitzer</u>, 253 F.3d 176, 186 (3d Cir. 2001) (citing <u>U.S. ex rel. Yesudian v. Howard Univ.</u>, 153 F.3d 731, 736 (D.C. Cir. 1998)).  "In proving that he was discriminated against 'because of' conduct in furtherance of a False Claims Act suit, a plaintiff must show that (1) his employer had knowledge he was engaged in 'protected conduct'; and (2) that his employer's retaliation was motivated, at least in part, by the employee's engaging in 'protected conduct.'"  <u>Hutchins</u>, 253 F.3d at 186.  "The requirement that employers have knowledge that an employee is engaged in 'protected conduct' ensures that § 3730(h) suits are only prosecuted where there has been actual retaliation."  <u>Id.</u> at 186 n.7.  "In most retaliation cases under § 3730(h), the two critical questions are (1) what sort of activity constitutes 'protected conduct,' and (2) whether the

23

employer was on notice that the employee was engaging in 'protected conduct.'" Id. at 189.

Determining whether a plaintiff was engaged in "protected conduct" involves determining "whether plaintiff's actions sufficiently furthered 'an action filed or to be filed under' the False Claims Act and, thus, equate to 'protected conduct.' Section 3730(h) specifies that 'protected conduct' includes 'investigation for, initiating of, testimony for, or assistance in' a False Claims Act suit." Id. at 187 (internal quotation marks and citation omitted) (quoting McKenzie v. BellSouth Telecomm., Inc., 219 F.3d 508, 516 (6th Cir. 2000)). This is a fact specific inquiry, and it "does not require the plaintiff to have developed a winning qui tam action…. It only requires that the plaintiff engage in acts … in furtherance of an action under the False Claims Act." Hutchins, 253 F.3d at 187 (internal quotation marks omitted) (quoting Yesudian, 153 F.3d at 739). The analysis may look to evidence of "internal reporting and investigation of an employer's false or fraudulent claims," Hutchins, 253 F.3d at 87, but "an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations" is not enough. Id. at 187-88 (quoting Yesudian, 153 F.3d at 740).

Once a plaintiff has shown that he was engaged in "protected conduct," he must show that he was discriminated "because of" his "protected conduct." Hutchins, 253 F.3d at 188. "To meet this requirement, a plaintiff must show his employer had knowledge that he was engaged in 'protected conduct' and that the employer retaliated against him because of that conduct." Id. The Third Circuit has adopted the holding of several other courts of appeals that "the knowledge prong of § 3730 liability requires the employee to put his employer on notice of the 'distinct possibility' of [FCA] litigation."

24

Id.  This notice of a "distinct possibility" of FCA litigation "is essential because without knowledge an employee is contemplating a False Claims Act suit, 'there would be no basis to conclude that the employer harbored § 3730(h)'s prohibited motivation, i.e., retaliation.'"  Id. (citing Mann v. Olsten Certified Healthcare Corp., 49 F. Supp. 2d 1307, 1314 (M.D. Ala. 1999)).  An employer may be on notice of such a "distinct possibility" of litigation "when an employee takes actions revealing the intent to report or assist the government in the investigation of a [FCA] violation."  Hutchins, 253 F.3d at 189; see also id. at 188 n.8 (noting that while "the 'protected conduct' and notice requirements are separate elements of a prima facie case of retaliation under § 3730 … the inquiry into these elements involves a similar analytical and factual investigation.")

In the instant case, Plaintiffs argue relators Amaya and Moody were engaged in "protected conduct" because they were not performing their job duties when they allegedly reported unlawful activities to other PEG employees, and they did so in furtherance of an action "filed or to be filed."  (Pls.' Opp'n at 52-53.)  The allegation in the FAC pertaining to relator Amaya is that she provided PEG, via its own reporting mechanism, with "specific information that [PEG's] directives and activities described [in the FAC] were … in violation of PEG's policies, which had been drafted to create the appearance of compliance with Federal law."  (FAC ¶ 320.)  Relator Amaya "wrote a letter dated January 12, 2011 to PEG Vice President Hastain, outlining multiple instances of misconduct, including improper grade changes, advancing unqualified students, failure to dismiss students not meeting SAP requirements, and systemic and unchecked misconduct by instructors."  (Id. ¶ 322.)  With respect to relator Moody, the Complaint avers that she too relied on PEG's reporting policy to provide PEG with "specific

25

information that [PEG's] directives and activities described [in the FAC] were … in violation of PEG's policies, which had been drafted to create the appearance of compliance with Federal law."  (Id. ¶ 236.)  She reported to PEG Vice President Hastain that "two executives at HSB-Wilmington … had directed her to change student grades without instructor authorization."  (Id. ¶ 237.)

        In both Counts, Plaintiffs contend that relators Amaya's and Moody's actions were "protected conduct" because they "plainly put PEG on notice of a possible qui tam action."  (Id. ¶¶ 322, 327.)  In reaching this conclusion they assert that PEG Vice President Hastain "knew, of course, that the overwhelming majority of students implicated by this misconduct were Federal financial aid beneficiaries."  (Id. ¶¶ 322, 327.)  Plaintiffs submit that relator Amaya's letter "thus outlined the salient elements of the fraud described [in the FAC] and it even alerted Hastain to a possible lawsuit by students."  (Id. ¶ 322.)  The allegations in relator Moody's claim also rest on the inference that, when she alerted Hastain that she was directed to change student grades, this was notice of "a material component of PEG's fraud on the United States, as described [in the FAC]."  (Id. ¶ 327.)

        Nowhere in the FAC do relators Amaya or Moody suggest that they were investigating, initiating, testifying for, or assisting with a FCA action when they alerted Hastain to the alleged wrongdoing.  See Hutchins, 253 F.3d at 187.  They do not allege that they mentioned a pending or future FCA action or threatened to report PEG's activities to the government in their communications with Hastain.  See id. at 189-90.  In fact, despite their conclusory statements in the pleadings, there is no evidence that they even connected the wrongful activity complained of with illegality, unlawful behavior, or

false claims for Federal student financial aid when they communicated with Hastain.  See id. at 190 (citing Robertson v. Bell Helicopter Textron, Inc., 32 F.3d 948, 951 (5th Cir. 1994)).  While the conduct relators Amaya and Moody complained of to Hastain might support their present FCA claim, it is not enough to infer that by merely raising those concerns in the past, relators Amaya and Moody "outlined the salient elements of the fraud described [in the FAC]," and were thus engaging in "protected conduct."  See Campion v. Northeast Utilities, 598 F. Supp. 2d 638, 658 (M.D. Pa. 2009) ("[Plaintiff's] merely reporting his concern about mischarging the government to his supervisor does not suffice to establish that he was acting 'in furtherance of' a qui tam action.") (citing Hutchins, 253 F.3d at 188, 190, 193).[16]  Because there is no indication relators Amaya and Moody did more than report allegedly wrongful actions undertaken by certain HSB and PEG employees to PEG Vice President Hastain, or that they did so "in furtherance of an action under the False Claims Act," the Court finds that they have not shown they were engaged in "protected conduct."  Id. at 187.[17]

---

[16] Plaintiffs filed their initial complaint on June 20, 2011 (Doc. No. 1), and it appears that the alleged retaliatory action against relator Amaya occurred in January of 2011 or earlier.  (See FAC ¶¶ 320-23.) Relator Moody's claim that PEG systematically retaliated against her for whistleblowing by creating a hostile work environment is not associated with any specific date in the Complaint, (see FAC ¶¶ 326-28), however the Court notes that she was employed from October, 2010, until she left the company in August, 2012.  (FAC ¶ 38.)  There is no indication in the FAC that the communications made by relators Amaya or Moody to Hastain regarding certain wrongdoings were related to, coincided with, or followed the filing of the original or later-amended Complaints.

[17] Based on many of the same considerations, the Court also notes that Plaintiffs have not shown that the discriminatory treatment they allegedly suffered was "because of" any "protected conduct."  Even if the Court accepted that relator Amaya's and Moody's actions were "protected conduct," the facts alleged give no indication that PEG retaliated against them as a result of that conduct.  See Hutchins, 253 F.3d at 188. Merely reporting conduct that might be an element of a false claims act, but may also just be reported wrongdoing, does not put the employer on notice that an employee is engaged in an "activity that reasonably could lead to a False Claims Act case."  Id. (quoting Yesudian, 153 F.3d at 742).  There is no indication that the two instances of communication, alleged in the FAC, could have been viewed by PEG as more than a suggestion for how PEG should improve or conduct its business more ethically, rather than as a precursor to litigation.  Hutchins, 253 F.3d at 189 (quoting Luckey v. Baxter Healthcare Corp., 183 F.3d 730, 733 (7th Cir. 1999), cert. denied, 528 U.S. 1038 (1999)).  Because the Court cannot read the

Accepting the facts as true and construing the allegations in the Complaint most favorably for Plaintiffs, relators Amaya and Moody have not stated a claim for retaliation under § 3730(h). For this reason, the Court will dismiss Counts V and VII of the FAC.

### c. Counts VI and VIII

In Counts VI and VIII Relators allege that Defendants intentionally inflicted emotional distress against relators Amaya and Moody. Because all Relators' claims arising under federal law will be dismissed, and Relators have pleaded no other basis for jurisdiction, the Court will decline to exercise supplemental jurisdiction over these remaining state-law claims. 28 U.S.C. § 1367(c)(3).

## IV.        LEAVE TO AMEND

When a complaint is dismissed for failure to state a claim, leave to amend should normally be granted. Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000); Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) ("When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile.")

Here, the Court is unable to conclude that Plaintiffs could not possibly amend their pleadings to adequately state their claims for retaliation under § 3730(h) against Defendants. Therefore, within the period of time set forth in the Order accompanying this Opinion, Plaintiffs may file a motion seeking leave to amend their FAC.

---

allegations as suggesting relators Amaya and Moody took "actions revealing the intent to report or assist the government in the investigations of a False Claims Act violation," it finds that PEG was not on notice of a "distinct possibility" of litigation. Hutchins, 253 F.3d at 188-89. As such, Plaintiffs have also failed to show that they were discriminated "because of" any alleged "protected conduct."

**V.     CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss will be **GRANTED**.

The dismissal of Counts I-IV will be with prejudice as to all parties except the

government.  Plaintiffs may file a motion for leave to amend the remaining Counts in

their Complaint within the time period specified in the Order accompanying this Opinion.

An accompanying Order shall issue.

Dated:   10/27/2014                                    s/ Robert B. Kugler
                                                       ROBERT B. KUGLER
                                                       United States District Judge