NOT FOR PUBLICATION                                                  (Doc. No. 52)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____
                                              :
UNITED STATES OF AMERICA, ex rel.             :
LAPORTE, et al.,                              :
                                              :
            Relators,                         :        Civil No. 11-3523 (RBK/AMD)
                                              :
      v.                                      :
                                              :        **OPINION**
PREMIER EDUCATION GROUP, L.P.                 :
et al.,                                       :
                                              :
            Defendants.                       :
_____       :

**KUGLER**, United States District Judge:

        This matter is a <u>qui tam</u> action, which Relators bring under the False Claims Act, arising

out of alleged fraudulent claims made by Premier Education Group, and its affiliated schools, to

the federal government.  Presently before the Court is Defendants' motion to dismiss the

complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Doc. No. 52.)

For the reasons expressed herein, Defendant's motion is granted-in-part and denied-in-part.

**I.      FACTUAL BACKGROUND**

        Relators Laura LaPorte, Angela Davenport, Pamela Hone, Robert Biaselli, Kelli J.

Amaya, Amanda Kenny, and Doris Moody ("Relators") brought this <u>qui tam</u> action on behalf of

the United States of America against Defendants Premier Education Group, L.P. and Premier

Education Group, G.P., Inc. d/b/a Branford Hall Career Institute, Harris School of Business,

Salter College, The Salter School, Seacoast Career Schools, and Suburban Technical School

(collectively, "PEG"), and John Does # 1-50, Fictitious Names (together with PEG, the

"Defendants"), pursuant to the Federal Civil False Claims Act, 31 U.S.C. §§ 3729, et seq. ("FCA").  Relators originally brought this action on June 20, 2011 (Doc. No. 1), and they subsequently amended the complaint four times.  Relators filed the Fourth Amended Complaint ("FAC") on February 27, 2014 (Doc. No. 46).

In their FAC, Relators explain that their lawsuit is based on the actions of PEG, which allegedly made or caused to be made false claims and statements in order to participate in the Federal student financial aid programs ("Federal Programs"), from 2006 onward.  (FAC ¶ 2; id. ¶ 97.)  They claim PEG violated federal regulations it was required to comply with in order to be eligible to receive Federal Program funding.  Specifically, PEG violated provisions of the contractual agreements between PEG and the Department of Education ("DOE"), called Program Participation Agreements ("PPAs"), in which PEG agreed to abide by federal regulations and not engage in material misrepresentations as a condition of PEG's eligibility to receive said funding. As required by the PPAs, PEG certified, each time it drew down student aid monies, that the funds were being expended in accordance with the conditions of those PPAs.  (Id. ¶ 3.)

Congress established various student loan and grant programs under Title IV of the Higher Education Act of 1965, 29 U.S.C. §§ 1070 et seq. ("HEA"), including the Federal Pell Grant Program, the Federal Family Education Loan Program and the Federal Direct Loan Program.  In 2008 Congress reauthorized the HEA, as amended, through its passage of the Higher Education Opportunity Act.  (FAC ¶ 60.)  In order to participate in the Title IV Federal Programs for financial aid, an institution such as PEG must (1) establish institutional and program eligibility, and then (2) ensure student eligibility prior to disbursing the Federal Program funds.  (Id. ¶ 61.)  There are federal requirements for institutions that wish to participate in Title IV Federal Programs, including the requirement that a school be accredited and licensed

to operate in each state in which it is doing business.  (Id. ¶ 64; 20 U.S.C. § 1001; 34 C.F.R. § 600.5(a)(4), (6).)  Institutions that wish to participate also may not make substantial misrepresentations to prospective applicants about the nature of the institution's educational programs or the employability of its graduates.  (FAC ¶ 65; 34 C.F.R. § 668.71; id. § 668.74; id. § 668.72.)  To qualify as eligible, a student must be enrolled or accepted for enrollment in an eligible program at an eligible institution, must have a high school diploma or recognized equivalent or satisfy some other means of obtaining eligibility (such as, during the relevant time period, having "obtained a passing score specified by the Secretary on an independently administered test"), and must be maintaining "Satisfactory Academic Progress" in his or her course of study according to the school's published standards, and in accordance with Federal guidelines.  (FAC ¶ 62; 34 C.F.R. § 668.32; id. § 668.34.)

All post-secondary schools must enter into PPAs with the DOE in order to be eligible to receive Title IV Federal Program funds, or have their students receive Title IV funding.  (FAC ¶ 67; 20 U.S.C. § 1094; 34 C.F.R. § 668.14.)  PPAs condition the initial and continued participation of an eligible institution in a Title IV Federal Program upon compliance with the regulations specified above.  (FAC ¶ 67; 34 C.F.R. § 668.14(a)(1).)  PEG has, since at least 2006, annually signed and submitted PPAs to the DOE on behalf of all of its educational institutions throughout the United States.  (FAC ¶ 88.)  These PPAs signed by PEG contain the same certifications that PEG was in compliance with all the applicable regulations described supra.  (Id. ¶¶ 89-96.)  Relators aver that PEG has "claimed and received substantial sums in Title IV funding from the [DOE] as a result of its fraudulent conduct."  (Id. ¶ 97.)

The first of the specific allegations is that PEG made false statements and concealed material information from state agencies and the DOE in order to ensure that it would maintain

its state licenses and accreditation status for each of its campuses in order to continue to receive

Federal Program funding.  (Id. ¶¶ 4, 6.)  This included actions such as fabricating job placement

statistics for graduates at its campuses, in order to remain licensed and accredited.  (Id. ¶ 6; id. ¶

257-58; id. ¶ 308.)  Second, Relators allege that PEG engaged in false advertising in an attempt

to induce students to enroll at its campuses, in violation of Federal Program regulations and its

PPAs.  (Id. ¶ 7.)  This involved misrepresenting the accreditation status of certain programs,

enrolling students into programs of study without disclosing that they would be effectively

disqualified from employment in their chosen fields upon graduation, and misrepresenting the

nature and success of PEG's career placement services.  (Id.; id. at 78-91.)[1]  Third, Relators aver

that PEG engaged in fraudulent conduct in order to secure financial aid for students who, but for

PEG's conduct, would not have been eligible for assistance from the Federal Programs.  (Id. ¶ 8.)

For example, PEG allegedly falsified records to make it appear that students had either graduated

from a recognized high school or received a GED in order to permit unqualified students to

enroll, and PEG improperly received and retained Federal Program assistance and monies for

those ineligible students.  (Id.; id. at 41-55.).  Fourth, PEG purportedly continued to falsify

student records once they were enrolled and receiving Federal Program financial aid, in order to

receive more Federal Program funding for which the students were in fact ineligible.  (Id. ¶ 9.)

To achieve this, PEG falsely certified students' "Satisfactory Academic Progress" on the Federal

Program financial aid recipient list by falsifying attendance records for students who were no

longer in attendance and changing student grades from failing to passing, and PEG falsified

financial aid records in order to secure more Federal Program funding than students should have

---

[1] For purposes of clarity, each time the Court cites to a paragraph or range of paragraphs in one of the
documents in the record it will use the "¶" symbol, and when it cites to a page or range of pages numbers
it will use the notation "[document] at [page number]."

been eligible to receive.  (Id.; id. at 55-72.)  Finally, Relators allege PEG's employee compensation system, as designed and implemented, did not comply with the Incentive Compensation Ban in Title IV of the HEA.  (Id. ¶ 10; id. at 72-75.)

The named relators are all reportedly original sources of the allegations in the FAC.  (Id. ¶ 17.)  Relator Laura LaPorte (LaPorte) worked as the Registrar at the Harris School of Business ("HSB") in Linwood, New Jersey ("HSB-Linwood"), in 2006 and 2007, and she was responsible for administering admissions tests, tracking student attendance, and inputting student grades into the computer system.  (Id. ¶ 19.)  She resigned her employment with PEG voluntarily.  (Id.)  Relator Robert Biaselli ("Biaselli") worked as an instructor at HSB-Linwood in 2006 and 2007.  (Id. ¶ 22.)  Relator Pamela Hone ("Hone") was an admissions representative at HSB-Linwood in 2006 and 2007.  (Id. ¶ 25.)  Relator Angela Davenport ("Davenport") was the Director of Education for HSB during 2009.  (Id. ¶ 28.)  In her role, Davenport worked directly with the registrar at the HSB campus in Cherry Hill, New Jersey ("HSB-Cherry Hill"), and was responsible for preparation of the HSB-Linwood personnel files.  (Id.)  She resigned her employment with PEG voluntarily.  (Id. ¶ 29.)  Relator Kelli J. Amaya ("Amaya") worked as the Externship Coordinator at HSB-Linwood from September, 2009, through June, 2010, and in July, 2010 she was promoted to Director of Education/Externship at HSB in Wilmington, Delaware ("HSB-Wilmington").  (Id. ¶ 32.)  She claims that, after she reported problems at the HSB-Wilmington campus, she was first demoted and then fired in January, 2011, as a result of "whistleblowing activities."  (Id.)  Relator Amanda Kenny ("Kenny") was hired as a Financial Aid Administrator for HSB-Wilmington in 2009, and was promoted to Director of Financial Aid at HSB-Wilmington in January, 2011.  (Id. ¶ 35.)  As Director of Financial Aid she was responsible for the submission of FAFSA forms to the DOE, for scheduling financial aid

disbursements, for drawing down Federal Program funds for HSB-Wilmington students, for preparing and processing all internal and external paperwork and reports and correspondence to the DOE relating to student financial aid, for monitoring each student's eligibility for financial aid on an ongoing basis, for attending weekly manager meetings and financial aid conference calls with other PEG schools, and for weekly meetings with the Director of Admissions and other PEG managers to monitor the financial aid process on a student-by-student basis, as well as to manage re-enrollments.  (Id.)  Relator Kenny voluntary resigned her position with PEG in October, 2011.  (Id.)  Relator Doris Moody ("Moody") was the Registrar at HSB-Wilmington from October, 2010, until August, 2012, at which point she alleges she was constructively terminated due to her "whistleblowing activities."  (Id. ¶¶ 38-39.)  As Registrar, her responsibilities included grade and attendance records input and generating reports of the same. (Id. ¶ 38.)

In their FAC, Relators allege that Defendants violated the FCA by (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval (FAC Count I (citing 31 U.S.C. § 3729(a)(1)(A)); [2] (2) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim (FAC Count II (citing § 3729(a)(1)(B)); [3] (3) conspiring to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) of § 3729(a)(1) (FAC Count III (citing § 3729(a)(1)(C));[4] and (4) knowingly making,

---

[2] To the extent the conduct occurred prior to May 20, 2009, Relators allege a violation of 31 U.S.C. § 3729(a)(1), the equivalent provision prior the FCA's 2009 amendments.  For purposes of this motion, any minor differences between the two provisions, are insignificant.

[3] To the extent the conduct occurred prior to May 20, 2009, Relators allege a violation of 31 U.S.C. § 3729(a)(2), the equivalent provision prior the FCA's 2009 amendments.  Any minor differences between the two provisions are insignificant for purposes of this motion.

[4] Relators also alleged violation of § 3729(a)(3) to the extent that the conduct complained of preceded the FCA's May 20, 2009 amendments.  Any minor differences between the two provisions are insignificant for purposes of this motion.

using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government (FAC Count IV (citing § 3729(a)(1)(G)).[5]  Additionally, Relators allege Defendants violated § 3730(h) by taking retaliatory action against relators Amaya and Moody in the terms and conditions of their employment because of lawful acts done by them in furtherance of this action under the FCA (FAC Counts V, VII).  Finally, Relators also allege that Defendants violated the rights of relators Amaya and Moody to be free from intentional infliction of emotional distress (FAC Counts VI, VIII).

As indicated above, the original Complaint was filed on June 20, 2011, under seal, the Third Amended Complaint was unsealed on July 2, 2013 (Doc. No. 18), and the FAC was filed on February 27, 2014.  On March 26, 2014, Defendants filed the present motion to dismiss the FAC.  The United States filed its Notice of Election to Decline Intervention on July 2, 2013, (Doc No. 17), and a Statement of Interest in Response to Defendants' Motion to Dismiss on May 21, 2014 (Doc. No. 60).

In their motion, Defendants argue that Relators' action must be dismissed for lack of jurisdiction under 31 U.S.C. § 3730(b)(5) and § 3730(e)(4).  (Defs.' Br. at 7–15.)  Additionally, they argue the claims are barred by the applicable statute of limitations.  (Id. at 15–16).  In the alternative, if the Court were to reach the merits of Relators' claims, Defendants move to dismiss Counts I-IV for failure to properly plead pursuant to Rule 8 and to plead fraud with particularity pursuant to Rule 9(b), (id. at 16-28), and/or to dismiss all Counts for failure to state a claim pursuant to Rule 12(b)(6).  (Id. at 28-55.)

---

[5] Here, too, Relators allege a violation of § 3729(a)(7) under the prior version, though as noted supra at note 3, is not relevant for purposes of the Court's analysis.

The Court initially ruled on Defendants' motion on October 27, 2014.  (See Doc. Nos. 76–77.)  The Court dismissed Counts I–IV for lack of jurisdiction on account of 21 U.S.C. § 3730(b)(5), which prohibits persons from bringing an action based on facts that formed the basis of a prior action under the FCA.  The Court reasoned that Relators' suit and Bumgarner et al. v. Premier Education Group et al., No. 10-787 (D.N.J. filed Feb. 17, 2010), concerned the same underlying facts and were therefore related cases.  (See Op. 11–18, Doc. No. 76.)  Siding with the D.C. Circuit's interpretation of § 3730(b)(5) and the "first-to-file" rule, this Court held that Bumgarner barred Relators' related suit under the first-to-file rule notwithstanding the fact that Bumgarner was dismissed prior to Relators' filing suit.  (Id. 19–22.)  The Court also dismissed Counts V and VII, finding Relators had failed to state a prima facie retaliation claim under § 3730(h),  and declined supplemental jurisdiction over the state law claims in Counts VI and VIII in the absence of any remaining federal causes of action.  (Id. 19–26.)  Relators appealed.

While their appeal was pending, the Supreme Court decided Kellogg Brown & Root Services, Inc. v. United States ex rel. Carter, 135 S. Ct. 1970 (2015), which both parties agree affects the Court's holding on the "first-to-file" rule.  Without deciding Relators' appeal, the Third Circuit remanded the case for this Court to reconsider in light of recent developments in the law.  Having been extensively briefed by the parties, the issues are now ripe for the Court's review.

## II.   LEGAL STANDARD

Defendants move to dismiss the FAC for lack of subject-matter jurisdiction under Rule 12(b)(1), for failure to state a claim under Rule 12(b)(6), and for failure to satisfy the heightened pleading standard of Rule 9(b).  "When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the

complaint for lack of subject matter jurisdiction, all other defenses and objections become

moot." In re Corestates Trust Fee Litig., 837 F. Supp. 104, 105 (E.D. Pa. 1993).

Where a defendant moves to dismiss under Rule 12(b)(1) for lack of subject-matter

jurisdiction, plaintiffs bear the burden of proving by a preponderance of the evidence that the

Court has subject matter jurisdiction. See Gould Elecs. Inc. v. U.S., 220 F.3d 169, 178 (3d Cir.

2000).   A district court may treat a party's motion to dismiss for lack of subject-matter

jurisdiction under Rule 12(b)(1) as either a facial or factual challenge to the court's jurisdiction.

Id. at 176.  A facial challenge is one in which a defendant argues "that the allegations on the face

of the complaint, taken as true, are insufficient to invoke the court's jurisdiction." Turicentro,

S.A. v. Am. Airlines, Inc., 303 F.3d 293, 300 & n.4 (3d Cir. 2002).  "In reviewing a facial attack,

the court must only consider the allegations of the complaint and documents referenced therein

and attached thereto, in the light most favorable to the Relator." Gould, 220 F.3d at 176 (citing

PBGC v. White, 998 F.2d 1192, 1196 (3d Cir. 1993)).  On the other hand, the court may consider

evidence outside the pleadings, in reviewing a factual attack.  Id.  A district court has

"substantial authority" to "weigh the evidence and satisfy itself as to the existence of its power to

hear the case." Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.3d 884, 891 (3d Cir. 1997).

"No presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed

material facts will not preclude the trial court from evaluating for itself the merits of the

jurisdictional claims." Id.

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss an action for failure to

state a claim upon which relief can be granted.  When evaluating a motion to dismiss, "courts

accept all factual allegations as true, construe the complaint in the light most favorable to the

plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff

may be entitled to relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)

(quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)). In other words, a

complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to

"state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009);

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

To make this determination, a court conducts a three-part analysis. Santiago v.

Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010). First, the court must "tak[e] note of the

elements a plaintiff must plead to state a claim." Id. (quoting Iqbal, 556 U.S. at 675). Second,

the court should identify allegations that, "because they are no more than conclusions, are not

entitled to the assumption of truth." Id. at 131 (quoting Iqbal, 556 U.S. at 680). Finally, "where

there are well-pleaded factual allegations, a court should assume their veracity and then

determine whether they plausibly give rise to an entitlement for relief." Id. (quoting Iqbal, 556

U.S. at 680). This plausibility determination is a "context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

A complaint cannot survive where a court can infer only that a claim is merely possible rather

than plausible. Id.

The more exacting standard in Federal Rule of Civil Procedure 9(b) applies to claims

raised under the False Claims Act because the claims allege fraud. U.S. ex rel. Wilkins v. United

Health Group, 659 F.3d 295, 301 n.9 (3d Cir. 2011). Rule 9(b) provides that "[i]n alleging fraud

or mistake, a party must state with particularity the circumstances constituting fraud or mistake.

Malice, intent, knowledge, and other circumstances of a person's mind may be alleged

generally." Fed. R. Civ. P. 9(b). Pursuant to Rule 9(b), a plaintiff must plead the circumstances

of the alleged fraud with particularity sufficient to put the defendant on notice of the "precise

misconduct with which [it is] charged." <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 223–24 (3d Cir.

2004).  A plaintiff may satisfy that requirement in two ways.  <u>Id.</u> at 224.  First, a plaintiff can

meet the requirement "by pleading the date, place or time of the fraud."  <u>Id.</u>  Second, the plaintiff

may use an "alternative means of injecting precision and some measure of substantiation into

their allegations of fraud."  <u>Id.</u> (citing <u>Seville Indus. Mach. v. Southmost Mach.</u>, 742 F.3d 786,

791 (3d Cir. 1984)).  Rule 9(b)'s heightened pleading standard is meant "to place the defendants

on notice of the precise misconduct with which they are charged, and to safeguard defendants

against spurious charges of immoral and fraudulent behavior."  <u>Seville</u>, 742 F.2d at 791,

<u>abrogated in part on other grounds by Twombly</u>, 550 U.S. at 557.  At a minimum, Rule 9(b)

requires "that the plaintiff identify the speaker of allegedly fraudulent statements."  <u>Klein v. Gen.</u>

<u>Nutrition Co., Inc.</u>, 186 F.3d 338, 345 (3d Cir. 1999).

## III.    DISCUSSION

"The FCA empowers a person, or 'relator,' to sue on behalf of the United States those

who defraud the government," in what is referred to as a <u>qui tam</u> suit.  <u>U.S. ex rel. Moore & Co.,</u>

<u>P.A. v. Majestic Blue Fisheries, LLC</u>, 812 F.3d 294, 297 (3d Cir. 2016).  If a relator's suit is

successful, he or she shares in any ultimate recovery.  Relators allege a violation of 31 U.S.C. §

3729(a)(1)(A), which imposes liability on any person who "knowingly presents, or causes to be

presented, a false or fraudulent claim for payment or approval."  A prima facie claim under the

FCA requires the plaintiff to show that "(1) the defendant presented or caused to be presented to

an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3)

the defendant knew the claim was false or fraudulent."  <u>U.S. ex rel. Wilkins v. United Health</u>

<u>Group, Inc.</u>, 659 F.3d 295, 311 (3d Cir. 2011).  The elements of a claim under § 3729(a)(1)(B),

which Relators also bring, are that "(1) the defendant made, or caused someone else to make, a

false or fraudulent record or statement; (2) the defendant knew the statement to be false or fraudulent; and (3) the statement was material to a claim." U.S. ex rel. Portilla v. Riverview Post Acute Care Ctr., 2014 WL 1293882, at *9 (D.N.J. Mar. 31, 2014).  Defendants seek dismissal of Relators' suit on multiple grounds, which the Court will address in turn.

## A.  Jurisdiction

### 1.  First-to-file Rule

As noted supra, the Court previously ruled that that Bumgarner barred Relators' claims under § 3729 (Counts I–IV), a holding that hinged on the Court's interpretation of § 3730(b)(5)'s first-to-file bar.  That bar provides that "[w]hen a person brings an action . . . no person other than the Government may intervene or bring a related action based on the facts underlying the pending action."  § 3730(b)(5) (emphasis added).  This Court, siding with the D.C. Circuit, interpreted "pending" to include cases that had been brought but dismissed prior to the filing of the related suit.  Thus, the Court held that the first-to-file rule barred Relators' claims even though Bumgarner had been dismissed prior to Relators filing suit.  The parties now contend, and the Court agrees, that the Supreme Court's holding in Kellogg Brown & Root Services, Inc. v. United States ex rel. Carter, 135 S. Ct. 1970 (2015), renders that holding incorrect.  In Kellogg, the Supreme Court held that "a qui tam suit under the FCA ceases to be 'pending' once it is dismissed."  135 S. Ct. at 1979.  Here, Bumgarner was dismissed prior to the filing of Relators' initial complaint and therefore imposes no jurisdictional bar to Relators' claims.  As such, the Court's previous holding that it lacked jurisdiction pursuant to § 3730(b)(5) is vacated.  The Court now denies Defendants' 12(b)(1) motion on grounds that Bumgarner divests this Court of jurisdiction.

## 2. Public Disclosure Bar

Defendant argues that Relators' claims are barred by 31 U.S.C. § 3730(e)(4), the FCA's public disclosure bar.  Between 1986 and 2010, the FCA's public disclosure bar precluded a relator from bringing a suit based on allegations of fraud that had already been publicly disclosed, subject to an exception if the relator was the "original source" of the information:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in (i) a criminal, civil, or administrative hearing, (ii) in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or (iii) from the news media, unless the action is brought by the Attorney General or the person brining the action is an original source of the information.

§ 3730(e)(4)(A) (2006).  This version of the statute defines "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based."  § 3730(e)(4)(B).

In 2010, Congress passed the Patient Protection and Affordable Care Act (ACA),[6] which, among other things, amended § 3730(e)(4).  See Pub. L. 111-148, § 10104(j)(2), 124 Stat. 119, 901–02.  As amended, § 3730(e)(4) states that,

> [t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> (ii) in a congressional, Governmental Accountability Office, or other Federal report, hearing, audit, or investigation; or
> (iii) from the news media,
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

---

[6] The ACA became effective March 23, 2010.

§ 3730(e)(4)(A) (2010).  The statute as amended defines "original source" as an individual who has voluntarily disclosed information to the Government or one "who has knowledge that is independent of and materially adds to" information already publicly disclosed.  § 3730(e)(4)(B).

Thus, the amended version of § 3430(e)(4)(A) provides more limited bases for dismissal than does the pre-ACA version.  The amended provision bars allegations raised in prior <u>federal</u> proceedings to which the government was a party, while the pre-amendment provision precludes allegations raised in either state or federal proceedings.  <u>Compare</u> § 3730(e)(4)(A)(i) (2010) (requiring courts to dismiss claims the basis of which have been publicly disclosed "in a <u>Federal</u> criminal, civil, or administrative hearing in which the Government or its agent is a party" (emphasis added)) <u>with</u> § 3730(e)(4)(A)(i) (2006) (divesting a court's jurisdiction over allegations publicly disclosed in "a criminal, civil, or administrative hearing").  The amended public disclosure bar is also no longer a jurisdictional limitation, <u>see</u> <u>U.S. ex rel. Moore & Co.,</u> <u>P.A. v. Majestic Blue Fisheries, LLC</u>, 812 F.3d 506, 519 (3d Cir. 2007) ("We agree that the public disclosure bar is no longer jurisdictional. . . ."), while the pre-amendment disclosure bar is a jurisdictional threshold.  <u>See</u> § 3730(e)(4)(A) ("<u>No court shall have jurisdiction</u> over an action under this section based upon the public disclosure of allegations or transactions . . . ." (emphasis added)).  Thus, the pre-amendment disclosure bar is analyzed under a 12(b)(1) standard while the post-amendment version is analyzed under a 12(b)(6) standard.

The parties disagree on which version of § 3730(e)(4) applies.  Defendants argue that the pre-amendment provision applies, while Relators argue that the post-amendment version applies. The Third Circuit has clarified that courts are to apply the version of the § 3730(e)(4) that was the law "at the time the alleged conduct in the Complaint took place."  <u>U.S. ex rel. Judd v. Quest</u> <u>Diagnostics</u>, -- Fed. App'x. --, 2015 WL 4025447, at *2 (3d Cir. Aug. 26, 2015) (quoting <u>U.S. ex</u>

rel. Judd v. Quest Diagnostics, Inc., No. 10-4914, 2014 WL 2435659, at *6 (D.N.J. May 30, 2014)); see also U.S. ex rel. Zizic v. Q2Admins., LLC, 728 F.3d 228, 232 n.3 (3d Cir. 2013). Citing the Supreme Court's decision in Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 945–56 (1997), the Third Circuit recognized the "presumption against retroactive legislation," particularly where, as here, "an amendment eliminates a defense to a qui tam suit." Judd, 2015 WL 4025447, at *2.  The Third Circuit also found "no indication . . . that Congress intended to make the amendments to the public disclosure bar retroactive." Id. at *2 (citing Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 559 U.S. 280, 283 n.1 (2010)).  In Graham, the Supreme Court declined to give an amendment retroactive effect where the amendment eliminated a defense to a qui tam suit.  599 U.S. at 283 ("The legislation makes no mention of retroactivity, which would be necessary for its application to pending cases given that it eliminates petitioners' claimed defense to a qui tam suit.").  If Judd, Hughes Aircraft, and Graham did not make it sufficiently clear, multiple circuit courts have also held that courts are to apply the public disclosure bar in effect at the time the conduct took place.  See, e.g., Cause of Action v. Chicago Transit Auth., -- F.3d --, 2016 WL 767345, at *5 n.6 (7th Cir. 2016) ("Our cases hold that the 2010 changes to § 3730(e)(4)(A) are not retroactive and therefore the applicable version of subsection (A) is the one that was 'in force when the events underlying the suit took place.'"); U.S. ex rel. Antoon v. Cleveland Clinic Found., 788 F.3d 605, 614–15 (6th Cir. 2015) (applying the pre-2010 version of section 3730(e)(4) to events that took place in 2007 and 2008); U.S. ex rel. May v. Purdue Pharma L.P., 737 F.3d 908, 915 (4th Cir. 2013) (declining to give retroactive effect to the post-amendment public disclosure bar because "the significant revisions to the statute 'change[] the substance of the existing cause of action'"(quoting Hughes Aircraft, 520 U.S. at 948)).

Where, as here, the complaint includes a continuing course of fraud that occurred both
before and after Congress amended the public disclosure bar, the court applies the pre-
amendment version of § 3730(e)(4) to conduct occurring prior to the amendment's enactment
and the post-amendment version to conduct occurring after the amendment took effect.[7]   As
such, the pre-amendment version of the public disclosure bar governs conduct occurring before
March 23, 2010 and the post-amendment version governs conduct occurring after.

Despite the substantive differences between the two versions of the public disclosure bar,
the fundamental analysis remains the same.  "To determine whether a Relator is barred by the
FCA's public disclosure provisions, we must first assess whether the relator's claim is based on
publicly disclosed allegations or transactions."  U.S. ex rel. Atkinson v. PA. Shipbuilding Co.,
473 F.3d 506, 519 (3d Cir. 2007).  This is a two-step analysis:  first, the Court must "determine
whether the information was disclosed via one of the sources listed in § 3730(e)(4)(A), and
second, the court must "decide whether the relator's complaint is based upon those disclosures."
Id.  To be properly considered "based upon" the publicly disclosed allegations, "the complaint
need only be 'supported by' or 'substantially similar to' the disclosed allegations and
transactions."  Id. (citing U.S. ex rel. Mistick v. Housing Auth. of the City of Pittsburgh, 186
F.3d 376 (3d Cir. 1999)).

---

[7] District courts within the Third Circuit have consistently done so.  See U.S. ex rel. Freedom Unlimited,
Inc. et al. v. City of Pittsburgh et al., No. 12-1600, 2016 WL 1255294, at *12 (D.N.J. Mar. 31, 2016)
("[A]llegations of pre-2010 conduct will be assessed under the pre-ACA FCA and allegations of post-
2010 conduct will be assessed under the post-ACA FCA."); U.S. ex rel. Moore & Co., P.A. v. Magestic
Blue Fisheries, LLC, 69 F. Supp. 3d 416, 423 (D. Del. 2014), rev'd on other grounds, 812 F.3d 294 (3d
Cir. 2015) ("The case at bar was filed after the PPACA amendment took effect and involves continuing
conduct, both before and after the PPACA amendment . . . [T]he court applies the pre-PPACA FCA to
pre-amendment conduct and the amended FCA to later conduct" (footnote omitted)); Judd, 2014 WL
2435659, at *6 ("Here, however, the initial Complaint was filed after the ACA-amended provision took
effect, while the pre-2010 conduct alleged in the Complaint occurred while the pre-ACA provision was
still in place.  Therefore, because the ACA-amended provision is not retroactive, the pre-ACA provision
applies to all pre-2010 conduct alleged in the case.").

Defendants argue that the allegations in the FAC are based upon allegations that appeared in four previous lawsuits and/or media coverage of those suits, namely (1) United States ex rel. Bumgarner v. Premier Education Group, No. 10-0787 (D.N.J. 2010), filed on February 17, 2010; (2) Gomez et al. v. Premier Education Group, L.P., No. L-4412-08 (N.J. Super Ct. 2008), filed on December 8, 2008; (3) Eagen et al. v. Premier Education Group, L.P., No. 2128-11 (N.J. Super. Ct. 2011), filed March 4, 2011; and (4) Harrigan et al. v. Premier Education Group, L.P., No. L-2924-07 (N.J. Super. Ct. 2007), filed on September 6, 2007.  The Court will address each of the alleged public disclosures as they apply in the context of both the pre- and post-amendment versions of the ACA.

 **(a) Bumgarner**

The parties do not dispute that the Bumgarner complaint constitutes a "civil hearing" as included in both the amended and unamended version § 3730(e)(4)(A).  See U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.3d 1149, 1155–56 (3d Cir. 1991) (rejecting a narrow reading of "hearing" and finding it includes "[i]nformation gleaned in litigation and on file in the clerk's office").  The parties dispute whether the complaint was a public disclosure.  To be "publically available," the disclosure must be "information that would have been equally available to strangers to the fraud transaction had they chosen to look for it." Stinson, 944 F.3d at 1155–56; see also Paranich, 396 F.3d at 333–34 (holding that a complaint constitutes a public disclosure if it is both filed with the court and publicly available).

Defendants argue that because Bumgarner was filed a year and a half prior to Relators' suit, it is properly considered a "public disclosure."  (Defs.' Br. 12.)  At the time Relators filed the instant suit, however, the Bumgarner complaint was sealed and was not available to the general public.  (See Doc. Nos. 6–10.)  It seems uncontroversial to the Court that "a sealed qui

tam complaint, of which a relator has no knowledge, is not a public disclosure for purposes of" § 3730(e)(4)."  U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp.2d 25, 46–47 (D.D.C. 2007) (reasoning that a sealed complaint is a "poor candidate" for public disclosure because it does not serve the purposes of § 3730, namely to encourage relators to come forward but to disallow parasitic lawsuits).  Thus, the Bumgarner complaint is not a public disclosure because it was not "equally available" to the general public—or Relators—at the time they filed their original Complaint in 2011.  See Stinson, 944 F.3d at 1155–56.

Even when considering Bumgarner from the date at which the seal was partially lifted to certain authorized parties in October, 2012, the Court finds that it is not a public disclosure. Relators assert that the allegations in the Bumgarner complaint were not revealed to them, and Defendants have not alleged otherwise.  Rather, they argue that "regardless of Relators' knowledge of the admitted unsealing," the partial unsealing renders the Bumgarner complaint a public disclosure because any stranger to the fraud could potentially have discovered the allegations contained therein.  (Defs.' Supp. Br. 3 (emphasis added).)  The Court disagrees.  The complaint was only partially unsealed and was unavailable to the public at large.  See U.S. ex rel Rush v. Agape Senior Servs., Inc., No. 13-0666, 2014 WL 6910480, at *9 (D.S.C. Aug. 18, 2014) ("[A] qui tam action whose existence is kept under seal, except for certain enumerated disclosures authorized by the court, is not a public disclosure within the meaning of the pre-amendment or post-amendment version of 31 U.S.C. § 3730(e)(4)(A).").  The Court is satisfied that Bumgarner does not divest the Court over jurisdiction of Relators' claims.

### (b) Harrigan, Gomez, and Eagen Complaints and Related News Media

The Harrigan, Gomez, and Eagen state suits ("the State Suits") allege a fraudulent scheme at HSB, a PEG-affiliated school.  The plaintiffs in those cases were students or former

students of HSB's Professional Medical Assistants ("PMA") program.  They alleged that HSB misrepresented that upon completion of the PMA program, students would be eligible to take the American Association of Medical Assistants certification exam—a credential that substantially increases earning potential—when in fact they were ineligible because HSB was unaccredited. (Harrigan Compl. ¶¶ 30–46; Gomez Compl. ¶¶ 23–26; Eagen Compl. ¶¶ 27–44.)  The plaintiffs also allege that PEG d/b/a HSB altered students' grades, permitted students to re-enroll in classes multiples times after failing, and changed students' attendance records in order to continue receiving funds from New Jersey programs, Federal Pell Grants, and subsidized and unsubsidized Federal Stafford loans. (Harrigan Compl. ¶¶ 56–59; Gomez Compl. ¶¶ 69–74; Eagen Compl. ¶¶ 58–61.)  The Press of Atlantic City and the Local Fox News, both online sources, also reported on the State Suits prior to Relators filing suit.  (See Howard Cert. Exs. L–O.)  Those news reports focus almost entirely on the allegations concerning the lack of proper accreditation, id. Exs. L–N, save for one story reporting on students being taught a CPR course by teachers who were not qualified to do so, id. Ex. O.

As indicated supra, information revealed through civil litigation, including civil complaints, constitutes a public disclosure under § 3730(e)(4)(A).  Paranich, 396 F.3d at 333–34. The Harrigan, Gomez, and Eagen complaints were filed in 2007, 2008, and 2011, respectively, well before the Relators filed the instant suit.  They therefore constitute the type of disclosure enumerated in the pre-ACA version of § 3730(e)(4)(A).  They do not qualify as public disclosures under the post-ACA version, however, because, as state suits, they do not constitute a "Federal, criminal, civil, or administrative hearing in which the Government or its agent is a party."  § 3730(e)(4)(a)(i) (2010).  Therefore, the pleadings in the State Suits qualify as public disclosures under the pre-ACA version of the statute only.

On the other hand, the news articles about the State Suits qualify as public disclosures under both versions of the statute.  Each version specifically enumerates allegations publicly disclosed by the "news media."  Plaintiffs do not dispute that the news articles covering the allegations in the State Suits constitute "news media."  See Freedom Unlimited, Inc., 2016 WL 1255294, at *16 ("Courts in this jurisdiction have held that information obtained through a publicly accessible website can qualify as 'news media' under the public disclosure bar.").

Therefore, the remaining inquiry is whether the allegations in the FAC are "based upon" these disclosures.  Atkinson, 473 F.3d at 519.  This analysis requires the Court to address each of Relators claims separately.  See U.S. ex rel. Merena v. SmithKline Beecham Corp, 205 F.3d 97, 102 (3d Cir. 2000) ("[I]n applying section (e)(4), it seems clear that each claim in a multi-claim complaint must be treated as if it stood alone."); see also U.S. ex rel. Boise v. Cephalon, Inc., Doc. No. 08-287, 2014 WL 5089717, *7 (E.D. Pa. Oct. 9, 2014) (reviewing the ways in which a district court may examine each claim independently, such as "by looking at each count of the complaint" or at "each theory of recovery").  In this instance, it makes little sense to review Relators' claims by looking to the separate counts in the FAC.  Indeed, nearly all of the FAC's factual allegations underlying the specific Counts are organized as a detailed 107-page preamble to the mere seven pages of specifically enumerated counts. (See generally FAC.)  Instead, it makes more sense to compare the allegations made in the State Suits—and related news media—to the FAC's many theories of liability.

When comparing the complaints, it is clear that the allegations in the FAC far exceed those in the State Suits.   The former contains allegations not even mentioned in the State Suits, including the following:

- PEG knowingly admitted students who did not possess a valid high school diploma or GED, in violation of the schools' published admissions criteria.  (See FAC ¶¶ 127, 132–155.)[8]

- PEG admitted known felons who were either ineligible for federal financial aid or could not obtain licensure in their chosen fields.  (See FAC ¶¶ 146–156.)

- PEG admitted individuals with learning disabilities, non-english speaking individuals, and illiterate individuals.  (See id. ¶¶ 157–70.)

- PEG completed FAFSA applications for prospective students who could not read or write English, or who were not capable of understanding the financial obligations they were undertaking.  (See id. ¶¶ 171–75.)

- PEG imposed rigid sales quotas on admissions representatives such that they would be fired if they failed to enroll at least five new students per week.  PEG tied admissions' representatives' performance and salaries to their ability to meet PEG's sales quotas.  (See id. ¶¶ 227–37.)

- PEG misrepresented to students that the credits earned at PEG schools were transferable to other institutions.  (See id. ¶¶ 278–286.)

- PEG used prohibited incentive compensation to induce employees to participate in fraudulent enrollment and graduation schemes.  (See id. ¶¶ 289–305.)

These allegations could not have been publicly disclosed by the State Suits or news media because the complaints in those cases—and the media coverage thereof—make no mention of these allegations.  Therefore, the Court properly has jurisdiction over these allegations in the FAC.

The Court also finds that it has proper jurisdiction over the FAC's allegations regarding accreditation, despite Defendants' arguments otherwise.  The State Suits consist almost entirely of allegations that HSB misrepresented to students in the PMA Program that they would be able to take the relevant certification exam when in reality they could not because HSB was not

---

[8] Defendants argue that this allegation is also contained in the second amended complaint in Eagen and is therefore a public disclosure on which Relators' suit is based.  However, this allegation was contained in Relators original complaint, filed on June 20, 2011, months before the filing of the second amended complaint in Eagen.  The original complaint in Eagen did not contain this allegation.

accredited by either the Commission on Accreditation of Allied Health Education Professionals

(CAAEP) or the Accrediting Bureau of Health Education Schools (ABHES).  (See generally,

Harrigan, Gomez, and Eagen Compls.)  The media coverage covers only these allegations.  The

FAC, on the other hand, does not contain allegations concerning HSB's lack of CAAEP or

ABHES accreditation.[9]  As such, the Court finds it properly has jurisdiction over these claims as

well.

     Multiple allegations in the FAC, however, resemble allegations in the State Suits.  First,

the FAC and the State Suits contain similar allegations concerning the altering of students'

grades, during similar time periods.  The complaints in the State Suits allege that HSB "changed

grades of students to pass them in order to continue" receiving government funds.  (Harrigan

Compl. ¶ 57; see also Gomez Compl. 70, Eagen Compl. ¶ 58.)  The FAC also alleges that PEG

changed students grades "from failing to passing, in order to mislead accrediting agencies and

Federal Programs" so that it could preserve the students eligibility for government funds.  (FAC

¶ 179).  However, the complaints in the State Suits contain no allegations regarding the specific

scheme or the manner in which HSB altered students' grades, while the FAC goes into much

detail about the alleged scheme:

> PEG implemented a top down scheme to falsify student grades . . . . PEG
> routinely pressured its administrators and instructors to ensure that students
> received passing grades regardless of the students' actual performance . . . .
> Through its well-known pattern of blaming and harassing instructors when
> students failed courses, PEG preempted the submission of failing grades . . . .
> [Director of Education Kathy Bertolini] was required to challenge any instructor
> who submitted a failing grade for a student, and to dispute the failing grade . . . .
> Similarly, at PEG's BHCI-Southington Campus, Computer Information
> Technology instructor Jay Baker, who was employed by the school between

---

[9] Relators' original Complaint contains allegations substantially similar to those in the State Suits.  (See
Doc. No. 1.)  In that pleading, Relators put forth allegations concerning HSB's misrepresentations on its
accreditation and the effects on those students wishing to apply for the medical assistant certification.
(See id. ¶ 41.)  However, these claims are no longer part of the case—they are not contained in the FAC,
which is the operative Complaint for Defendants' motion to dismiss.

1999–2003 and 2004–2011, and his fellow instructors routinely were asked to change student grades from failing to passing . . . . PEG retaliates against instructors who fail to comply with its demand that they change grades from failing to passing . . . . For those instructors who refused to acquiesce in PEG's pressure to "pass" unqualified students in order to permit certification of their satisfactory academic progress, PEG administrators routinely changed those students grades from failing to passing without the instructor's consent, ordering Registrars to falsely certify students' [satisfactory academic progress].

(FAC ¶¶ 179–86; see also ¶¶ 179–89; 190–211.)  None of these allegations, nor the specifics of this scheme, were contained in the State Suits.  The FAC is also not limited to conduct occurring at HSB.

Second, both the State Suits and the FAC make allegations concerning the falsification of students' attendance records.  The former alleges that "Defendants counted students for attendance by marking them present when they were not present so as to continue to receive government funds."  (Gomez Compl. ¶ 73; see also Harrigan Compl. ¶ 59, Eagen Compl. ¶ 61.) The FAC makes a similar allegation, but expands on it substantially:

Pursuant to 34 C.F.R. 668.22(b), PEG was obligated to track its students' attendance, and thus their continued eligibility to receive Federal student aid.  In this regard, PEG based a student's withdrawal date on that student's "last date of attendance" ("LDA") at an academically-related activity . . . . Under PEG's LDA tracking system, if a student had not been in a PEG building for fourteen (14) days, the student would have to be dropped/failed, and any unused Federal student aid returned.  PEG engaged in various fraudulent conduct to manipulate its LDA reports, including altering students' attendance records, in order to ensure that students not benefiting from instruction at PEG would maintain their enrollment and, accordingly, their eligibility for Federal Program financial aid, notwithstanding the fact that they were not attending class . . . . During the course of auding HSB-Wilmington student attendance records, Relator Amaya discovered that the attendance records of numerous students had been falsified to make it appear they were attending class when that was not actually the case . . . . During her tenure as Registrar at PEG's HSB-Linwood campus, Relator LaPorte was responsible for keeping the school's student attendance records on the CampusVue computer application.  She regularly was instructed by Campus Director Steven Strong and Director of Education Craig Hennequant to alter student attendance records in order to avoid "failing" a student for lack of attendance in class.  When Relator LaPorte voiced her concerns about this practice, Hennenquant responded:  "Just do as I tell you."

(FAC ¶¶ 212–19.)  This additional information concerning the scheme at HSB and PEG's other campuses was not included in the State Suits.

The question therefore becomes whether the additional information provided in the FAC prevents the otherwise similar allegations from being "based on" the complaints in the State Suits and the media coverage thereof.  The Third Circuit has emphasized that the public disclosure bar is not limited to actions "solely based upon" public disclosures but rather, it includes actions "even partly based upon" such allegations.  Zizic, 728 F.3d at 238 (citing U.S. ex rel. Precision Co. v. Koch Indus., 971 F. Supp. 548, 553 (10th Cir. 1992)). To analyze whether an allegation is "based upon" a public disclosure, the Third Circuit uses "an algebraic representation of the nature and extent of disclosure required to raise the jurisdictional bar." Atkinson, 473 F.3d at 519.   The equation provides that "[i]f $X + Y = Z$, $Z$ represents the allegation of fraud and $X$ & $Y$ represent its essential elements." Id.   The public disclosure bar precludes a relator from brining suit "[i]f either $Z$ (fraud) or both $X$ (misrepresented facts) and $Y$ (true facts) are disclosed by way of a listed source." Id.

Here, the Court finds that the allegations in the FAC concerning the changing of grades and attendance records are "based upon" the similar allegations in the State Suits.  The State Suits allege that PEG d/b/a HSB routinely changed students' grades from failing to passing and altered attendance records to receive federal financial aid to which they were not entitled.  Here, although Relators have revealed details and facts absent from the complaints in the School Suits, the underlying allegation of fraud—"$Z$"—was previously disclosed by the State Suits.  As such, the Court finds the pre-ACA version of §3730(e)(4)(A) divests it of jurisdiction over Relators' allegations concerning the pre-2010 altering of grades and attendance records, unless Relators can demonstrate they are the original sources of that information. § 3730(e)(4)(A).

### 3. Original Source Exception

To be an "original source" under the pre-2010 version of the statute, "a relator's knowledge must be both direct and independent," meaning that the knowledge must "not depend on public disclosures" and be "obtained without any intervening agency, instrumentality or influence." Atkinson, 437 F.3d at 520 (internal quotation marks and citations omitted). Relators allege that they engaged in their own independent investigation of the conduct described in the FAC and are therefore original sources. (Pls.' Opp. Br. 20, Doc. No. 53.) As indicated supra, however, Relators have argued that the post-amendment version of § 3730 applies and therefore have not engaged in a pre-amendment original source analysis. (See Opp. Br. 17–21.) As such, Relators have submitted no Record and instead rely on the allegations in the FAC and their brief to satisfy this Court of its jurisdiction over their claims.

On a 12(b)(1) factual attack on jurisdiction, however, the Court is not obligated to accept Relators' claims as true. Here, the Court is left without any Record on which to examine the Relators' alleged investigation into the alteration of students' grades and attendance records. Without any evidence that the Relators undertook an investigation into the alleged frauds occurring at PEG's campuses, the Court cannot find that their investigation renders them the original sources of the information. Indeed, Relators suggest that their investigation included public sources, see Pl.'s Br. 20, and "the extent of reliance on information already in the public domain should be a consideration during the original source inquiry, even if that information is not a public disclosure within the meaning of § 3730(e)(4)(A)." Atkinson, 473 F.3d at 522. Here, the Court does not know on what, if any, public disclosures Relators' investigation relied. If it relies even in part on the public disclosures identified above, then Relators are not original

sources of the information.  If it does not, even then, Relators may still fail to qualify as original

sources.  As the Third Circuit explained in <u>Zizic</u>,

> reliance on public information that does not qualify as a public disclosure under §
> 3730(e)(4)(A) may also preclude original source status, depending on the extent
> of that reliance, and the nature of the information in the public domain, as well as
> the availability of information, and the amount of labor and deduction required to
> construct the claim.

<u>Zizic</u>, 728 F.3d at 240 (internal citations and quotations omitted).  In sum, the Court has no

information whatsoever about the alleged investigation, whether from the Record or from the

FAC.  The Court therefore finds that Relators have failed to meet their burden and demonstrate

that the Court has jurisdiction over the allegations that PEG falsified students' grades and

attendance records for the purpose of receiving federal funds.  As such, the Court has jurisdiction

over the allegations that PEG falsified students' grades and attendance records only to the extent

that conduct occurred after March 23, 2010 because the post-ACA public disclosure bar does not

mandate dismissal of allegations that were disclosed in state proceedings.

### B.  Implied Certification Theory

The Third Circuit has recognized an "implied false certification theory," which "attaches

when a claimant seeks and makes a claim for payment from the Government without disclosing

that it violated regulations that affected its eligibility for payment."  <u>Wilkins</u>, 659 F.3d at 305.

The rationale is that "the act of submitting a claim for reimbursement itself implies compliance

with governing federal rules that are a precondition to payment."  <u>Id.</u> (citing <u>Mikes v. Straus</u>, 274

F.3d 687, 696 (2d Cir. 2001)); <u>see</u> <u>also</u> <u>United States v. Science Applications Int'l Corp.</u>, 626

F.3d 1257, 1266 (D.C. Cir. 2010) ("Courts infer implied certifications from silence where

certification was a prerequisite to the government action sought.").  "Thus, in contrast to

reviewing the expressed representations made to the government, an analysis of an implied false

certification claim focuses on 'the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment.'" Freedom Unlimited, Inc., 2016 WL 1255295, at * 26 (citing Wilkins, 659 F.3d at 313).

The Third Circuit has also qualified the doctrine, stating that "the implied certification theory of liability should not be applied expansively." Id. at 307.   In order to state a claim under this theory, a claimant must show more than a simple regulatory violation; a party must show that compliance with those regulations was required to receive federal funds. Id. "In other words, a plaintiff must set forth a plausible showing with sufficient particularity 'that if the Government had been aware of the defendant's violations of the . . . laws and regulations that are the bases of [the] plaintiff's FCA claims, it would not have paid the defendant's claims.'" Freedom Unlimited, 2016 WL 1255294, at *26 (quoting Wilkins, 659 F.3d at 307).  The Third Circuit intended this requirement to avoid turning the FCA "into a 'blunt instrument to enforce compliance with all . . . . regulations rather than 'only those regulations that are a precondition to payment.'" Id. (citing Rodriguez v. Our Lady of Lourdes Med. Ctr., 552 F.3d 297, 304 (3d Cir. 2008)).  Defendants move to dismiss Relators' claims to the extent they are premised on the implied certification theory because (1) relators have not identified any regulatory violations, and (2) to the extent they do, those regulations are conditions of participation and not of payment.

### 1.  Lack of Regulatory Violation

Defendants allege that Relators cannot state a claim under the implied false certification theory because they have not alleged conduct that actually violates any Title IV, HEA regulation.

### (a) Misleading Career Placement Performance

Relators allege that PEG misled prospective students about its schools' career placement performance.  Specifically, Relators allege that PEG's promoted materially misleading employment statistics that were based on disingenuous—and often falsified—employment data. (See generally FAC ¶¶ 259–77.)  Defendants allege that Relators' have not pled any regulatory violation.  (Defs.' Br. 32–33.)  The Court disagrees.  In their opposition brief and in their FAC, Relators cite to 34 C.F.R. § 668.74, which prohibits "misrepresentations regarding the employability of an eligible institution's graduates."  (See Pls.' Br. 39; FAC ¶¶ 66, 259.) Although the then-current version mentions only three specific prohibited misrepresentations, the statute specifically says the list is non-exhaustive.  See § 668.74 ("Misrepresentation by an institution regarding the employability of its graduates includes, but is not limited to . . . .").  The then-current version of § 668.71, also cited by Relators, also prohibits substantial misrepresentations, which it defines as "[a]ny misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment."  Taking Relators' allegations as true, as the Court is required to do at this stage, the Court finds that Relators have sufficiently alleged that Defendants' alleged practices in reporting job placements violated § 668.74.  The fact that the regulatory structure is such that Defendants have freedom in determining how to calculate their statistics does not defeat Plaintiffs' allegations that the calculations they used were materially misleading or in fact false.

### (b) High Pressure Tactics to Enroll Students

Next, Defendants argue that Relators state no regulatory infraction with their allegations concerning Defendants' use of high-pressure tactics to enroll students. (Defs.' Br. 44.)  The Court agrees.  Relators allege that PEG imposed rigid sales quotas on admissions representatives,

threatened termination if the quota was not met, and trained its admissions representatives to use excessive pressure to enroll students. However, Relators cite no regulation that Defendants have allegedly violated. Although the HEA prohibits the payment of "any commission, bonus, or other incentive payment," 20 U.S.C. § 1094(a), the Act does not concern personnel decisions, such as the hiring and the firing of employees. See <u>U.S. ex rel. Bott v. Silicon Valley Colls.</u>, 262 Fed. App'x 810, 812 (9th Cir. 2008) ("The decision to fire an employee is not covered by the Act because termination is not a prohibited 'commission, bonus, or other incentive payment.'"); <u>U.S. ex rel. Whatley v. Eastwick College</u>, No. 13-1226, 2015 WL 4487747, at *7 ("[T]he incentive compensation ban does not prohibit institutions from terminating employees based on their recruitment numbers."). As such, the Court finds Relators' allegations concerning "high-pressure tactics," FAC ¶¶ 227–48, fail to state a regulatory violation.

### (c) Incentive Compensation Ban

Relators allege that PEG violated the Incentive Compensation Ban by (1) paying bonuses based on students' successful graduation, and (2) paying bonuses based on the number of students enrolled. The Ban prohibits an institution from providing,

> any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities or in making decisions regarding the awarding of title IV, HEA program funds, except that this limitation does not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive title IV, HEA program funds.

34 C.F.R. § 669.14(22)(i). Defendants take issue with Plaintiffs' allegations concerning PEG's "Admissions Representative Compensation Plan" ("the Plan"), which provides bonuses based on students successfully graduating as opposed to enrolling. (FAC ¶ 297.) Defendants contend that the Plan falls within a Safe Harbor of the Incentive Compensation Ban that exempts from prohibition "[c]ompensation that is based upon students successfully completing their

educational programs, or one academic year of their educational programs, whichever is shorter."  See 34 C.F.R. § 668.14(22)(ii)(E) (in effect until June 30, 2011).

Relators disagree, arguing that providing bonus compensation based on graduation rates, when those graduation rates themselves have been altered to allow students to reenroll, violates the Ban.[10] (See FAC ¶ 291.)  As written, however, the Plan does not appear to violate the Incentive Compensation Ban.  It awards admissions representatives $40 and $60 bonuses, depending on their level of seniority, for each graduate, and is "structured and introduced formally to do our utmost to motivate and assist our students in the pursuit of success."  (Id. ¶ 297.)  Thus, as written, bonuses are tied to students' success rather than admissions representatives' success in securing enrollments, and the provision of bonuses based on student success is expressly contemplated in the Ban's Safe Harbor.

Relators also do not sufficiently allege that the Plan, as implemented, violates the Incentive Compensation Ban under this theory.  First, many of Relators allegations do not assert that Defendants actually compensated employees for successful graduates.  (See FAC ¶¶ 292, 294–95.)  They have alleged only that Defendants promised bonus compensation for successful graduates. The Incentive Compensation Ban prohibits providing not promising any commission, bonus, or other incentive payment.  Even if promising bonuses was actionable, Relators do not allege that these employees were promised bonuses in exchange for changing grades and thereby reenrolling students. (See FAC ¶¶ 292, 94.)  The Ban prohibits incentive payments based directly or indirectly upon success in securing enrollments.  34 C.F.R. § 668.14(22)(i).  Regardless of

---

[10] Specifically, Relators allege that "PEG used the promise of bonuses to incentivize its personnel to first enroll as many students as possible (regardless of the prospective students' qualifications), and then to keep them enrolled (regardless of actual performance or attendance, often based on falsified grade and attendance records) for as long as possible in order to milk as much Federal Program funding as possible."  (FAC ¶ 291.)

whether PEG's conduct qualifies for a safe harbor, alleging that PEG promised bonus payments based on graduation rates is insufficient to state a violation of the Ban because it does not connect the bonuses to the alteration of grades and resulting continued enrollment.  In other words, Relators have not sufficiently alleged that the admissions representatives were incentivized by the provision of graduation bonuses to alter grades so that they could reenroll students and see them forward to graduation.

Relators have alleged that Tammy Denesha received a $7,000.00 bonus for changing students' grades and attendance records.  Although concerning if true, this allegation is not enough on its own to state a violation of the Incentive Compensation Ban because Relators have not connected this allegation to the "success in securing enrollments."  § 668.14(22)(i).  Relators have not alleged that Tammy Denesha, as Director of Education of Branford Hall, was in any way responsible for recruiting or admitting students.  See id. (prohibiting payments on the basis of enrollments to  "any person or entity engaged in any student recruiting or admission activities or in making decisions regarding the awarding of title IV, HEA program funds." (emphasis added)).  Without such an allegation, Relators have not stated that the Plan violates the Incentive Compensation Ban.

Relators also allege that PEG provided bonuses based on enrollments.  Specifically, they allege that Marlena Berghammer and Susan Kershaw received a $2,000 admissions bonus for enrolling a high number of students, FAC ¶ 293, and that Relator Hone received a two-day vacation trip to Connecticut as a reward for her weekly enrollments, Id. 292.[11]  These allegations, when combined with the more general allegations regarding PEG's provision of bonuses based

---

[11] Relators' also allege that PEG promised bonuses to Russell McKee, id. ¶ 295, but this allegation fails to state an actionable claim.  Without allegations that Defendants actually paid McKee a bonus for enrollment, there has been no regulatory violation.

on enrollments are sufficient to state a violation of the Incentive Compensation Ban under Rule 12(b)(6).

### (d) Admitting Unqualified Students

Defendants move to dismiss Relators' allegations that PEG admitted students who did not pass a Wonderlic test because such allegations do not state a regulatory violation.  The Court agrees.  Relators have not identified what regulation was violated by admitting students who failed the Wonderlic test, nor how doing so would have resulted in any false claim.  To the extent Relators attempt to state a claim based on these allegations, such claim is dismissed.

Defendants also move to dismiss Relators' claims that Defendants admitted unqualified students, namely convicted felons who were either ineligible to receive financial aid or to practice the careers for which they were receiving training, see FAC ¶¶ 146–56; and students who had learning disabilities or could not read or speak English, see FAC ¶¶ 157–70.[12]  The Court agrees that Relators' allegations concerning the admission of felons fail to state a regulatory violation.  (See FAC ¶¶ 146–70.)  Relators point to no regulation prohibiting the admission of students with a felony conviction, and do not contest Defendants' motion for dismissal on this ground.  Moreover, 34 C.F.R. § 668.40 states that a student is ineligible for title IV funds if he or she has been convicted for possession or sale of illegal drugs at a time when a student was enrolled and receiving Title IV funds.  34 C.F.R. § 668.40.  Relators do not allege a violation of this regulation.

Likewise, Relators' allegations concerning the admission of students with learning disabilities and limited English language skills fail to identify a cognizable regulatory violation.

---

[12] Defendants do not move to dismiss on 12(b)(6) grounds Relators' allegations concerning the impropriety of admitting students without a high school diploma or equivalent degree. (See Mot. to Dismiss 35–37.)

Relators cite 34 C.F.R. § 668.32 and § 668.34, but neither of those regulations prohibits

admitting students with learning disabilities or limited English language skills.  In fact,

Defendants are prohibited from denying admission to students on the basis of their disability.

See 34 C.F.R. § 104.42 ("Qualified handicapped persons may not, on the basis of handicap, be

denied admission or be subjected to discrimination in admission or recruitment by a recipient to

which this subpart applies.").  Moreover, § 668.34 does not regulate student admissions—it

governs the tracking of a student's progress after the student is admitted and enrolled.  See 34

C.F.R. § 668.34.  As such, these allegations, FAC ¶¶ 157–70, are dismissed.

### (e) Altering Students' Grades and Attendance Records

Relators allege that PEG falsified students' grades in order to keep students eligible for

federal financial aid, in violation of 34 C.F.R. § 668.34.  (FAC ¶¶ 176–224.)  The version of §

668.34 in effect until June 30, 2011 required students enrolled in academic programs of more

than two years to maintain "satisfactory progress"—defined as a "C" average or equivalent—in

order to maintain eligibility for Title IV funds.  See 34 C.F.R. § 668.34(a) (effective until June

30, 2011).  Defendants allege that Relators cannot maintain a cause of action under § 668.34

because the students in this case were not enrolled in academic programs that were two years or

longer.  (Defs.' Br. 38.)  Although Relators do not dispute Defendants' factual representation, the

Court cannot—at the motion to dismiss stage—dismiss Relators' claims on facts alleged by the

Defendants.  The Court is obligated to accept all facts alleged in the FAC as true.  Defendants'

may file a motion for summary judgment on Relators' allegations at any time they feel the record

is sufficient.

Even then, however, 34 C.F.R. § 668.32, which governs students' eligibility to receive

federal financial aid, requires a student to "maintain[] satisfactory progress in his or her course of

study according to the institution's published standards of satisfactory progress that satisfy the

provisions of § 668.16(e), and, if applicable, the provisions of § 668.34."  § 668.32(f).  Even if

Relators' conduct does not violate § 668.34 because the students are enrolled in longer-than-two-

year programs, § 668.16(e) requires a school to apply reasonable standards to evaluate a

students' progress.  Here, Relators have alleged that PEG falsified students' grades and was

therefore not applying the required reasonable standards.  Defendants are free to argue that their

maintenance of grades in fact was reasonable but that is to be resolved at the motion for

summary judgment stage.

Relators also allege that PEG falsified students' attendance records, in violation of 34

C.F.R. § 668.22(b), which Defendants argue is inapplicable on its face.  Although Defendants are

correct that this regulation governs the treatment of Title IV funds when a student withdraws, the

Court finds that Relators have sufficiently pled a violation of the regulation.  Subsection (b)(3) in

effect during the relevant period required an institution "to take attendance if an outside entity

(such as the institution's accrediting agency or a State agency) has a requirement, as determined

by the entity, that the institution take attendance."  § 668.22(b)(3)(i) (effective until July 1,

2011).  In the event that an institution is required to take an attendance, § 668.22(b)(1)

establishes that a student's withdrawal date is the "last date of academic attendance as

determined by the institution from its attendance records."  Here, Relators allege that PEG

violated the attendance policy imposed by their accreditor by manipulating attendance records to

maintain students' eligibility for federal funds.  By doing so, Relators allege PEG improperly

retained financial aid funds.  Relators' allegations sufficiently state a violation of § 668.22(b).

They allege that PEG did not comply with the attendance policy set by its accreditors and as a

result, improperly retained funds to which it was not entitled.  To the extent Defendants allege

that the accrediting body did not actually impose attendance parameters on PEG, that, too, may

be an issue best resolved at the motion for summary judgment stage.

### ii.      Remaining Regulations Are Conditions of Payment

As mentioned <u>supra</u>, the crux of the implied certification theory is whether compliance

with a regulation is a condition of payment versus a condition of participation.  The Third Circuit

distinguishes between the two based on the consequences of noncompliance, with conditions of

payment resulting in nonpayment and conditions of participation resulting in administrative

sanctions.  <u>Wilkins</u>, 659 F.3d at 309 (citing <u>U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.</u>,

543 F.3d 1211, 1219–20 (10th Cir. 2008)).  "[A] plaintiff must set forth a plausible showing with

sufficient particularity 'that if the Government had been aware of the defendant's violations of

the . . . laws and regulations that are the bases of [the] plaintiff's FCA claims, it would not have

paid the defendant's claims.'"  <u>Freedom Unlimited</u>, 2016 WL 1255294, at *26 (quoting <u>Wilkins</u>,

659 F.3d at 307).  Defendant argues that Relators allege non-compliance with regulations that are

conditions of participation, not of payment, while Relators and the Government as amicus curiae

argue that the PPAs and Title IV regulations are conditions of payment.  The Court agrees with

Relators and the Government.

Defendants are correct that PPA stands for Program <u>Participation</u> Agreement, not

Program <u>Payment</u> Agreement, but the difference is not as distinct in the Title IV, HEA context.

In <u>United States ex rel. Hendow v. University of Phoenix</u>, 461 F.3d 1166, 1176 (9th Cir. 2006),

the Ninth Circuit  described the difference between conditions of payment and those of

participation in the context of the HEA as a "distinction without a difference," adding that, "[i]n

the context of Title IV and the Higher Education Act, if we held that conditions of participation

were not conditions of payment, there would be no conditions of payment at all—and thus, an educational institution could flout the law at will." Hendow, 461 U.S. at 1176.

In Sobek v. Education Management, LLC, No. 10-131, 2013 WL 2404082 (W.D. Pa. 2013), the court likened the student education funding context to the AKS regulations found to be conditions of payment in Wilkins.  2013 WL 2404082, at *3.  The Sobek court found that alleged violations of the Incentive Compensation Ban and misrepresentations of accreditation and job placements statistics were "material" enough to satisfy the condition of payment requirement at the pleading stage.  Id. at *2.  The Court similarly finds here.  Federal regulations and the PPA condition initial and continued participation in title IV programs, and by extension, the receipt of title IV HEA funding, on compliance with the PPA and the regulations therein. See 20 U.S.C. § 1094; 34 C.F.R. § 668.14.  The United States is expressly authorized to withhold funds from a non-compliant school.  See 20 U.S.C. § 1094(c)(1)(G) (providing for the promulgation of rules concerning an "emergency action" to withhold funds from a non-compliant institution).  The Court is also not convinced that Relators allege only "minor" misrepresentations that would not warrant withholding of funds under the then-current version of 34 C.F.R. § 668.75.  (See Defs.' Br. 44.)  Relators have plead with sufficient particularity that the United States would have refused payment had it known of PEG's regulatory violations. Defendants are welcome to defeat liability at the motion for summary judgment stage, if it can be shown that the United States would not have refused payment.  See Sobek, 2013 WL 2404082, at *3.

Defendants urge the Court to follow a ruling out of the U.S. Court of Appeals for the Seventh Circuit in United States v. Sandford-Brown, Limited et al., 788 F.3d 696 (7th Cir. 2015). There, the Seventh Circuit held that "FCA liability is not triggered by an institution's failure to

comply with Title IV Restrictions subsequent to its entry into a PPA, unless the relator proves that the institution's application to establish initial Title IV eligibility was fraudulent."   788 F.3d at 711.   However, in <u>Sandford-Brown</u>, the Seventh Circuit completely rejected the doctrine of implied false certification, <u>id.</u> at 711-712, which the Third Circuit recognized in <u>Wilkins</u> and which has been consistently applied within this Circuit.   As such, the Court declines to follow <u>Sandford-Brown</u>.[13]

### C.  Reverse False Claims Under 31 U.S.C. §§ 3729(a)(7) (1994) and 3729(a)(1)(G) (2009)

Relators also allege a reverse false claim.  A reverse false claim essentially requires a plaintiff to show that a defendant failed to refund money or property that it was obligated to return to the government.  The obligation to return such money to the government must be clear. <u>See</u> <u>U.S. ex rel. Quinn v. Omnicare, Inc.</u>, 382 F.3d 432, 444 (3d Cir. 2004).

Prior to 2009, the reverse false claims provision of the FCA imposed liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government . . . ."  § 3729(a)(7).  On May 20, 2009, Congress enacted the Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. No. 111-21, 123 Stat. 1617 (2009), which amended the FCA and designated § 3729(a)(7) as § 3729(a)(1)(G) and applied it to conduct that occurred after the amendment took effect.[14]  The amended version imposes liability on anyone who

---

[13] Even under the reasoning of <u>Sandford-Brown</u>, however, Relators' allegations could still survive.  In the FAC, Relators allege that PEG signed and submitted annual PPAs to the Department of Education, (<u>see</u> FAC ¶ 88), and that their fraud was ongoing from 2006 to 2011.  Under <u>Sandford-Brown</u>'s reasoning, PEG violated the FCA by entering into the yearly PPAs when it knew that it was already in noncompliance with the regulations contained therein and that it had no intention of complying with them.

[14] Relators contend that § 3720(a)(1)(G) as amended applies to all of the conduct in the FAC because Relators filed suit after the amendment took effect.  However, as it has with every other non-retroactive provision of the FCA, the Court finds it most appropriate to apply the law that was in place at the time the conduct took place.

"knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." § 3720(a)(1)(G).

Here, Relators appear to alternatively plead their § 3729(a)(1)(A)–(B) claims under the reverse false claims provision. They essentially allege that PEG received payment by implicitly falsely certifying that it was in compliance with its PPAs and the regulations cited therein. Consequently, payments it received were undue, prompting a duty to refund those payments.[15] (See FAC ¶¶ 344–45.) In other words, the same funds that Defendants received through fraudulently certifying compliance with the PPAs is the same money that they allegedly did not refund to the Government. Defendants allege that Relators' reverse false claim cause of action must be dismissed because it is duplicative and redundant of Relators § 3729(a)(1)(a)–(b) claims. The Court agrees.

Courts within this circuit have consistently held that the reverse false claims provision is not a vehicle to simply recast an identical claim under a traditional false claim provisions. See U.S. ex rel. Petratos v. Genentech, Inc., -- F. Supp. 3d --, 2015 WL 6561240, at *9 (D.N.J. Oct. 29, 2015); Sobek, 2013 WL 2404082, at *29; U.S. ex rel. Thomas v. Siemens AG, 708 F. Supp. 2d 505, 514 (E.D. Pa. 2010). Relators allege that two of these cases, Thomas and Sobek,

---

[15] Specifically, Relators allege that,

> [w]hen PEG learned through its own investigation and the whistleblowing activity of Relators Amaya and Moody that its agents and employees had submitted or caused to be submitted knowingly false or fraudulent claims for Federal financial aid dollars, it was required to disclose those facts to the Government and to refund the amount of the overpayments to the Government.

FAC ¶ 144. However, Relators' traditional false claims causes of action allege that PEG was actively engaged in the fraud—that it was a fraud carried out from the top down. (See generally FAC.) Thus, by saying that PEG had a duty "when it learned" of the fraud, Relators are actually alleging that PEG had a duty when it "carried out" the fraud. Based on the pleadings, PEG knew of the fraud at its inception.

analyzed the pre-FERA reverse false claims provision, and that the amended version does in fact

permit a claim under § 3720(a)(1)(G) that is the inverse of conduct violating §§ 3729(a)(1)(A)

and 3729(a)(1)(B).  The Court, however, sees no such clarification in the text of the statute, and

declines to rely on a Senate Report alone.[16]  Moreover, Petratos, too, declined to recognize such

a reverse false claim under the amended version of the statute.  The Court therefore finds that

Relators have not stated a claim under § 3729(a)(7) or § 3729(a)(1)(G).  Relators have not

alleged a concealment or avoidance of an obligation that arose independent from the allegedly

false certifications of compliance with the PPA and the regulations therein.  To the extent,

Relators allege that Defendants falsified or concealed the students' ineligibility, such fraud forms

the basis of their § 3729 (a)(1)(A)–(B) claims, further demonstrating the duplicative nature of the

claims.  As such, Defendants' motion to dismiss Count IV of the Complaint is granted.

**D.  Conspiracy Under 31 U.S.C. §§ 3729(a)(3) and 3729(a)(1)(C)**

Relators allege a violation of § 3629(a)(1)(c).[17]  Specifically, they allege Defendants

"conspired, and may still be conspiring, with the various entities and/or persons described herein

(as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. §§

---

[16] Relators cite to the Senate Report, which discusses the definition of "obligation" as meant in the intended version.  The Report mentions that the definition will be helpful to Government contractors who receive money incrementally from the Government based on cost estimates but who are overpaid on account of an overestimation of the ultimate cost.  See S. Rep. 111-10, at 14 (2009), available at 2009 WL 787872.  That paragraph states that,

> any action or scheme created to intentionally defraud the Government by receiving overpayments, even if within the statutory or regulatory window for reconciliation, is not intended to be protected by this provision.  Accordingly, any knowing any improper retention of an overpayment beyond or following final submission of payment as required by statute or regulation—including relevant statutory or regulatory periods designated to reconcile cost reports, but excluding administrative and judicial appeals—would be actionable under this provision.

Id.

[17] Relators allege violations of 31 U.S.C. § 3729(a)(3) to the extent wrongdoing occurred prior to May 20, 2009.  (See FAC at Count III.)

3729(a)(1) & (a)(2)."[18]  To state a conspiracy under the FCA, a plaintiff must show "(1) a conspiracy to get a false or fraudulent claim allowed or paid and (2) an act in furtherance of the conspiracy."  Atkinson, 473 F.3d at 514.  Importantly, an agreement between two or more persons is the "essence" of a conspiracy under the FCA.  U.S. ex rel. Cestra v. Cephalon, Inc., No. 14-1842, 2015 WL 3498761, at *12 (E.D. Pa. June 3, 2015).  Defendants allege that Relators have failed to state a conspiracy claim because they have not sufficiently pled either element of a conspiracy claim and because the intracorporate conspiracy doctrine mandates dismissal.

Here, the Court finds that Relators have not identified an agreement to defraud the Government.  The Complaint alleges only that Defendants conspired with "various entities and/or persons described herein (as well as other unnamed co-conspirators)," which is vague and insufficient to state a plausible entitlement to relief.  It does not specify which specific entities or persons were party to the alleged conspiracy.  In their Opposition Brief, Relators assert that the agreement was between Defendants PEG GP and PEG LP, but the Court reviews the sufficiency of Relators' allegations as they are alleged in the complaint, not in their brief.  The Court sees no such allegation in the FAC.  Rather, the FAC continually refers to PEG GP and PEG LP as if they were one entity, rather than two conspiring entities.  (FAC ¶ 46 ("PEG LP and PEG GP are collectively referred to herein as "PEG" and each has been operated in all material respects as alter ego for the other.").)  Indeed, Relators have pled that PEG GP assumed management control of PEG LP and is responsible for the actions alleged in the Complaint.  (Id. ¶ 44.)  These facts do not allow the Court to infer an agreement between the two because Relators have effectively pled that PEG GP and PEG LP are the same entity for all intents and purposes.  As such, Count III is dismissed.

---

[18] Relators also allege that Defendants conspired to violate the equivalent sections of the previous version of the FCA, namely §§ 3729(a)(1)–(2).  (See FAC ¶¶ 341.)

**E.  Heightened Pleading Standard**

"Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of . . . fraud with all of the essential factual background that would accompany 'the first paragraph of any newspapers story'—that is, the 'who, what, when, where, and how' of the events at issue." U.S. ex rel. Pilecki-Simko v. Chubb Inst., No. 06-3562, 2010 WL 1076228, at *7 (D.N.J. Mar. 22, 2010) (quoting In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002)). Relators may also "use an alternative means of injecting precision and some measure of substantiation into their allegations of fraud." U.S. ex rel. Underwood v. Genentech, Inc., 720 F. Supp. 2d 671, 676 (E.D. Pa. 2010) (quoting Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 658 (3d Cir. 1988)).  Defendants move to dismiss a number of Relators' claims on grounds that Relators have not pleaded the PPA violations with the requisite particularity.  (See Defs.' Br. 17–28.)  The Court has already dismissed a number of these allegations on 12(b)(6) grounds and therefore addresses only those that remain.

As an initial matter, the Court declines to limit Relators' allegations to only those campuses where the alleged conduct took place.  (See Defs.' Br. 25.)  Relators sufficiently allege throughout the FAC that PEG dominates the management of all its schools and that it is responsible for establishing the schools' goals and policies. (See, e.g., FAC ¶ 103 ("The corporate team is responsible for setting overall corporate coals and strategies, and overseeing the daily operations at each of PEG's campuses."); id. ¶ 104 ("Across all the PEG Schools, PEG management employed a unified corporate strategy that was managed out of the corporate office in Connecticut, and that focused on increased admission and profits above all else.").  Courts within this circuit have declined to limit relators' allegations where they have made a similar showing.  In Sobek, the Court rejected Defendants' argument that a relator could not allege a

41

company-wide fraud perpetrated by all of Defendants' universities over an eight-year period

when he worked only at one of Defendant's universities and for a limited time.  2013 WL

2404082, at *24.  The court explained that as an associate director of admissions, it was plausible

that the relator "acquired knowledge of EDMC system-wide corporate policies designed and

utilized in service of the overarching, system-wide false certification financial aid scheme

alleged, and spanning a longer period of time than his actual employment period of almost two

and one-half years."  Id. at *25.  The Sobek court relied on the reasoning of Judge McVerry in a

related case:

> Plaintiffs allege that EDMC corporate headquarters signed and submitted the
> PPA's on behalf of all of its related educational institutions . . . . In addition,
> Plaintiffs aver that the compensation plan was developed by an EDMC-wide task
> force . . . . Because government funding represented such a significant source of
> EDMC's revenues, it is plausible that any conduct which would have imperiled
> those revenues, such as the alleged violations of the Incentive Compensation Ban,
> would have required approval from the highest levels of EDMC management.  In
> sum, Plaintiffs have pled the involvement and knowledge of senior EDMC
> executives.  Because Plaintiffs' theory is that there was one, EDMC-wide scheme
> controlled by top-level executives, it is not necessary to allege separate conduct
> by each of the affiliated schools named as Defendants.

Id. (quoting United States v. Educ. Mgmt. Corp., 871 F. Supp. 2d 433, 453 (W.D. Pa.

2012)).

The Court finds the reasoning and Sobek and Education Management Corp. persuasive

and declines to limit Relators' claims to only those schools where they allege specific instances

of misconduct.  Just as the plaintiffs did in Education Management Corp., Relators here allege

that PEG's CEO or his designee signed all of PPAs executed by the schools.  (FAC ¶ 94.)

Relators also worked at various HSB locations for a time period spanning from 2006 to 2012,

and held positions such as Director of Education of HSB (Relator Davenport), Registrar of HSB-

Wilmington (Relator Moody), and Director of Financial Aid at HSB-Wilmington (Relator

Kenny).  Just as the court in <u>Sobek</u> reasoned, it is entirely plausible that Relators obtained

knowledge of PEG's corporate-wide policies while working in these various positions at multiple

HSB campuses for a cumulative six years.  For these reasons, the Court declines to limit Relators

allegations to only those campuses where they have specifically alleged misconduct took place.

The Court will evaluate Relators' allegations under Rule 9(b) as they pertain to a company-wide

scheme.

### 1.  Causing Financial Aid To Be Awarded to Ineligible Students

Relators allege that Defendants caused financial aid to be awarded to students to who had

no high school diploma and were therefore ineligible to receive financial aid.  Defendants allege

that Relators allegations are insufficient because Relators do not specify why the individuals

were ineligible for financial aid, identify students who actually submitted claims for Title IV

funding, or sufficiently plead that Defendants acted with the requisite scienter.  (Defs.' Br. 17–

20.)  Relators dispute each of Defendants' grounds for dismissal and argue that a relaxed Rule

9(b) standard is appropriate because the FAC alleges a broad scheme of corporate fraud and the

facts lie "peculiarly within the defendant's knowledge or control."  (<u>See</u> Pls.' Br. 28 (quoting <u>In

re Craftmatic Sec. Litig. v. Krastow</u>, 890 F.2d 628, 645 (3d Cir. 1989)).)

The Court need not determine whether a relaxed Rule 9(b) standard is more appropriate

because Relators have failed to state a claim at all.  Relators allege that students were ineligible

to receive financial aid because they did not have a high school diploma or equivalent, and that

Title IV funding is available to the student "only if he has a high school diploma or its

recognized equivalent."  (FAC ¶ 132 (citing 34 C.F.R. § 668.32(e)(1).)  Relators are incorrect—§

668.32(e) provides multiple ways that a student may qualify for Title IV funding apart from

obtaining a high school diploma or its equivalent.[19]  For instance, a student may be eligible if he

or she was home-schooled and received credentials provided for under state law.  § 668.32(e)(4).

Here, Relators have alleged only that students had no high school diploma, but have failed to

allege that the students were wholly ineligible from receiving aid because they did not qualify

under any of the alternative means provided for in § 668.32(e).  Without doing so, Relators have

not alleged a regulatory violation.  As such, Relators claims alleged in paragraphs 132–45 of the

FAC are dismissed.

### 2.   Material Misrepresentations to Induce Prospective Students to Enroll

Relators allege that Defendants misrepresented to students that it lost its institutional

accreditation status in 2011.  Relators allege that HSB-Voorhees lost its institutional

accreditation in 2011 after an audit, but nevertheless continued to operate without institutional

accreditation while falsely certifying otherwise.  (FAC ¶ 257.)  Relators allege that the school's

Director Rosemary Parker instructed the Director of Admissions Nicole Gentles to lie to other

within the school and students about the school's accreditation.  (Id.)  They also allege that this

was done at the direction of PEG's Regional Vice President Nick Hastain, and was done with the

intention of retaining eligibility and, consequently, Title IV funding.  In sum, Relators

allegations sufficient to establish the "who, what, when, where, and why."  Pilecki-Simko, 2010

WL 1076228, at *7.

The Court also finds that Relators have satisfied Rule 9(b) with respect to allegations

concerning career placement performance, FAC ¶¶ 259–77, and those concerning the

transferability of course credits, id. 278–86.  Relators identify the various tactics employed to

---

[19] This section of Title IV was amended multiple times over the relevant period.  Each version, however, provides multiple ways a student may qualify for federal financial aid other than obtaining a high school diploma or its equivalent.  See § 668.32(e) (2006); id. (2008); id. (2009); id. (2010); id. (2011).

carry out each violation, such as miscounting successful job placements, falsifying employment records, and instructing students that their credits would be transferrable to any other college or university or to any other school offering a similar career program.  (See id. ¶¶ 266, 271, 291.) Relators identify specific individuals at various PEG schools responsible for committing such violations at each school, as well as the senior PEG representatives from whom they received instructions to do so.  (See id. ¶¶ 266–75, 278–85.)  The Court finds Relators' allegations satisfy the heightened standard of Rule 9(b).

### 3. Incentive Compensation

Lastly, the Court finds that Relators have sufficiently pled that Defendants' schools falsely certified compliance with the Incentive Compensation Ban by paying bonuses based on enrollments.  As indicated supra, Relators specifically allege that Defendants paid bonuses to two individuals based on their successful enrollments.  (See FAC ¶¶ 293, 295.)  Relators identify the amount of the bonuses, where and when the bonuses are provided, and the reasoning for such bonuses.  As such, Relators have satisfied Rule 9(b)'s requirements.

### F. Statute of Limitations[20]

Defendants argue that the FCA's six-year statute of limitations bars Relators § 3729 claims.[21]  (See Defs.' Br. 15.)  Citing United States v. The Baylor University Medical Center, 469 F.3d 263 (2d Cir. 2006), Defendants contend that the statute of limitation runs from August 9, 2013, the date on which the Third Amended Complaint was unsealed.  (Id. at 15.)  The Court disagrees.  Baylor's specific holding that does not apply in the instant case.  There, the Second

---

[20] The Court reviews Defendants' argument with respect to only those claims that have not been dismissed infra.

[21] Defendants also argue in their motion that Relators Amaya and Moody's retaliation claims are barred by the applicable statute of limitations.  Those claims, however, are not at issue.  The Court's previous Opinion and accompanying Order dismissed Relator Amaya and Moody's retaliation claims for failure to state a claim under Rule 12(b)(6).  That holding is not before this Court on remand.

Circuit held that the <u>Government's</u> complaint-in-intervention does not relate back to the original

<u>qui tam</u> complaint filed under seal and therefore commences, for statute of limitations purposes,

on the date on which it files its complaint-in-intervention.[22]  <u>Id.</u>  <u>Baylor</u> has no bearing on the

commencement date of <u>Relators'</u> FCA claims.  <u>See</u> <u>U.S. ex rel. Grupp v. DHL Exp. (USA), Inc.</u>,

47 F. Supp. 3d 171, 179 (W.D.N.Y. 2014) (distinguishing <u>Baylor</u> on the grounds that it

addressed the commencement date of the Government's complaint-in-intervention, not the

original <u>qui tam</u> complaint); <u>Hayes v. Dept of Educ. of the City of New York</u>, 20 F. Supp. 3d

438, 444 (S.D.N.Y.) (finding <u>Baylor</u> inapposite on the issue of "when a relator herself tolls the

statute of limitations for her own claims").

       Defendants alternatively argue that the allegations in the FAC should relate back only to

the filing of the Third Amended Complaint, which Relators filed on May 9, 2013, because it

superseded the prior complaints rendering them of no legal effect.  (Defs.' Br. 16.)  Defendants'

position is simply incorrect.  Rule 15(c)(1)(b) provides that an amendment to a pleading relates

back to the date of the original pleading when "the amendment asserts a claim or defense that

arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the

original pleading."[23]  Here, Relators commenced this action on June 20, 2011, with the filing of

---

[22] Subsequent to the decision in <u>Baylor</u>, the FCA was amended to allow the Government's complaint-in-intervention to relate back to the filing of the <u>qui tam</u> complaint "to the extent that the claim of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint."  31 U.S.C. § 3731(c).

[23] The full text of Federal Rule of Civil Procedure 15(c)(1) provides as follows:
   (1)  When an Amendment Relates Back.  An Amendment to a pleading relates back to the date of the original pleading when:
   (A) The law that provides the applicable statute of limitations allows relation back;
   (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or
   (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period of Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
      (i)    received such notice of the action that it will not be prejudiced in defending on the merits; and

46

the sealed original complaint, within the statute of limitations.  Therefore, so long as the

allegations in the subsequent complaints relate back to the original complaint, Relators claims

are not time-barred.  <u>See</u> Fed. R. Civ. P. 15(c)(1)(b).  The Court finds that a number of Relators'

allegations in the FAC relate back to the original complaint, including allegations that PEG

falsified grades, falsified attendance records, and violated the incentive compensation ban. (<u>See</u>

Compl. at 11–15, 19–20.)  A number of allegations that remain, however, relate back only to the

second amended complaint, which the Court notes is substantially similar to the FAC, and which

Relators filed on November 27, 2012.  Specifically, the second amended complaint put

Defendants on notice of Relators allegations concerning PEG's misrepresentation regarding of

schools' accreditation status, graduate career placement performance, and the transferability of

course credits.  (<u>See</u> Second Am. Compl. ¶¶ 223, 258–59, 260–76.)  Thus, these allegations are

actionable to the extent it occurred on or after November 27, 2006.

## G.  Intentional Infliction of Emotional Distress

Relators Amaya and Moody each bring a claim of intentional infliction of emotion

distress under Delaware law, where they reside and were employed with PEG, for PEG's

retaliatory conduct.  Relator Amaya alleges that, in retaliation for her "whistleblowing

activities," PEG created a hostile work environment, including demoting her and then using her

demotion to embarrass her at a campus staff meeting, and eventually terminating her.  (<u>Id.</u> ¶¶

321–23.)  Relator Moody alleges that PEG created a hostile work environment in retaliation for

disclosing PEG's improprieties and constructively terminated her.  (<u>Id.</u> ¶¶ 327–28.)

---

(ii)     knew or should have known that the action would have been brought against it, but for a
mistake concerning the proper party's identity.

Defendants move to dismiss Relators Amaya and Moody's claims on grounds that the

Delaware Workers' Compensation Act precludes claims for intentional infliction of emotional

distress.  (Defs.' Br. 53–54.)  The Delaware Workers' Compensation Act provides as follows:

> Every employer and employee, adult and minor, except as expressly excluded in
> this chapter, shall be bound by this chapter respectively to pay and to accept
> compensation for personal injury or death by accident arising out of and in the
> course of employment, regardless of the question of negligence and to the
> exclusion of all other rights and remedies.

Del. Code. Ann. Tit. 19, § 2304 (2016).  "This statute precludes any tort claims for personal

injury arising out of and in the course of employment, including for emotional distress."  Parker

v. Comcast Corp., No. 04-344, 2005 WL 2456221, at *2 (D. Del. October 5, 2005).  However,

the Workers' Compensation Act does not preclude claims "that involve a true intent by the

employer to injure the employee."  Id. (quoting Rafferty v. Hartman Walsh Painting Co., 760

A.2d 157, 159 (Del. 2000).  "To show such an intent and to survive a motion to dismiss, there

must be more than a mere allegation that there was an intentional injury; there must be facts

alleged which, if true, show a deliberate intent to bring about an injury."  Id. (internal quotation

marks and citations omitted).

In Parker, cited by Relators, and in EEOC v. Avecia, Inc., No. 03-320, 2003 WL

22432911, (D. Del. Oct. 23, 2003), reconsideration denied in 2004 WL 1077915 (Apr. 28, 2004),

cited by Defendants, the court held that the employers' actions were insufficient to show a

deliberate intent to injure the plaintiffs because the actions taken "were not unusual in the

employment environment."  Parker, 2005 WL 2456221, at *3; see also Avecia, 2004 WL

1077915, at *2.  In Parker, the plaintiff alleged that in retaliation "(1) her work was criticized; (2)

she was told to resign or face an increased workload, being 'written up,' other discipline, and

eventually being fired for cause; (3) a file was developed that documented poor work

performance; and (4) she was terminated."  2005 WL 2456221, at *3.  In Avecia, the plaintiff alleged that her employer "scrutinized her vacation requests, work assignments, and progress more than any other employees," "required her to remain at her work station during work breaks," and prohibited her from displaying personal items around her work area.  2003 WL 22432911, at *1.  The Court found none of this conduct, when accepted as true, sufficiently alleged that the employers deliberately set out to harm the plaintiffs.

Here, Relator Moody alleges that "PEG began systematically to retaliate against Relator Moody for her whistleblowing activity, creating a hostile work environment."  (FAC ¶ 328.) However, Relator Moody does not allege any specific actions PEG took against her, other than stating PEG created a hostile work environment and constructively terminated her.[24]  Such bare allegations are insufficient to withstand a motion to dismiss and do not demonstrate a "deliberate intent" on the part of PEG to cause Relator Moody emotional distress.  As such, Relator Moody's claim for intentional infliction of emotional distress is dismissed.

Relator Amaya makes similar allegations as Relator Moody, albeit her factual allegations are a bit more detailed.  She similarly alleges that PEG created a hostile work environment in retaliation for her whistleblowing activity and demoted her from her position as Director of Education.  The former allegation is conclusory with little to no factual support, and the latter is the type of conduct that typically occurs in the workplace.  Parker, 2005 WL 2456221, at *3; see also Avecia, 2004 WL 1077915, at *2.  Despite Relator Amaya's allegation that "PEG possessed a deliberate intent to bring about an injury to Relator Amaya," FAC ¶ 354, these allegations do not demonstrate a deliberate intent to inflict intentional harm on Relator Amaya.

---

[24] Relator Moody even asserts that prior to being constructively terminated, "PEG never informed Moody that she had any performance issues."  Id. at 329.

49

She further alleges that PEG singled her out and "professionally embarrassed [her] during a campus staff meeting as having been demoted." (Id. ¶ 328.) Even if the Court were to find that using Relator Amaya's demotion to embarrass her demonstrates "deliberate intent" on PEG's part, she still has not sufficiently pled that PEG exhibited "extreme and outrageous behavior" when they used her demotion to embarrass her. Jordan v. Delaware, 433 F. Supp. 2d 433, 444 (D. Del. 2006). "Extreme and outrageous conduct has been defined as behavior, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. at 444 (internal quotation marks omitted) (quoting Mattern v. Hudson, 532 A.2d 85 (Del. Super. 1987)). As distasteful as such behavior is, the Court cannot find that embarrassing Relator Amaya on account of her demotion was "beyond all possible bounds of decency." As such, Relator Amaya's claim for intentional infliction of emotional distress is dismissed.

## IV.   LEAVE TO AMEND

"[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." Phillips, 515 F.3d at 245 (citing Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004)). Indeed, even when "a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).

Here, the Court finds that allowing the Relators to amend their complaint would be futile. The Court dismissed Relators' claims not because the Complaint lacked sufficient detail to state a claim but because the facts alleged do not state a claim as a matter of law. Relators could

remedy these deficiencies only by alleging new facts entirely.  As such, the Court declines to grant Relators' leave to amend those claims that the Court has dismissed.

**V.  CONCLUSION**

For the reasons expressed herein, Defendants' motion to dismiss is granted-in-part and denied-in-part.

Dated: 05/10/2016                                                s/Robert B. Kugler
                                                                         ROBERT B. KUGLER
                                                                         United States District Judge